## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JAMES R. ZAZZALI, as Trustee for the DBSI
Estate Litigation Trust and as Trustee for the
DBSI Private Actions Trust,

        Plaintiff,

    v.

HIRSCHLER FLEISCHER, P.C. & JOHN
DOE 1-10,

        Defendant.

Civil Action No. 1:11-cv-0614 (LPS)

---

### THE TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT HIRSCHLER FLEISCHER, P.C.'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

---

**GIBBONS P.C.**

Natasha M. Songonuga, Esq. (Bar No. 5391)
1000 N. West Street, Suite 1200
Wilmington, DE 19801-1058
Telephone: (302) 295-4875
Facsimile: (302) 295-4876
E-mail: nsongonuga@gibbonslaw.com

Of Counsel:

Brian J. McMahon, Esq.
E. Evans Wohlforth, Jr., Esq.
Debra A. Clifford, Esq.
*Counsel to James R. Zazzali, Trustee*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................................ii

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF NATURE OF PROCEEDINGS ............................................................2

SUMMARY OF ARGUMENT ...........................................................................................3

FACTUAL BACKGROUND ..............................................................................................3

DISCUSSION ......................................................................................................................6

    I.    The Complaint Satisfies the Basic Threshold for Pleading.........................................6

        A.    The Complaint Contains Sufficient Factual Allegations................................8

            1.    Investor Reliance ...............................................................................8

            2.    RICO Predicate Acts ..........................................................................9

            3.    Conduct of a RICO Enterprise .........................................................13

            4.    Conspiracy (RICO and Civil Conspiracy) .......................................16

            5.    Malpractice.......................................................................................18

            6.    Aiding and Abetting Breach of Fiduciary Duty and Fraud..............18

    II.    Hirschler's Legal Defenses are Invalid or Not Properly Raised On this Motion ......................................................................................................................20

        A.    The Insiders Harmed the DBSI Companies .................................................20

        B.    In Pari Delicto .............................................................................................21

        C.    The Securities Fraud Exception Does Not Bar the RICO Claims.................26

        D.    Breach of Fiduciary Duty/Breach of Trust...................................................28

    III.    The Fraudulent Transfer Counts are Well-Pled .......................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alexander v. DeLong, Caldwell, Novotny, & Bridgers, LLC (In re Terry Mfg. Co.)*,
    358 B.R. 429 (Bankr. M.D. Ala. 2006) .................................................................. 30

*Allstate Ins. Co. v. Etienne*,
    2010 U.S. Dist. LEXIS 113995 (E.D.N.Y. Oct. 22, 2010) ..................................... 10

*Am. Int'l Group, Inc. v. Smith*,
    976 A.2d 872 (Del. Ch. 2009) ............................................................................... 25

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ....................................................................................... 6, 7

*Bank of Am. v. Musselman*,
    222 F. Supp. 2d 792 (E.D. Va. 2002) ................................................................ 9, 29

*Barry v. Pac. W. Constr., Inc.*,
    103 P.3d 440 (Idaho 2004) .................................................................................... 25

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*,
    362 B.R. 624 (Bankr. S.D.N.Y. 2007) .................................................................. 30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................... 2, 6

*Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.)*,
    352 B.R. 36 (Bankr. D. Del. 2006) ....................................................................... 30

*Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group)*,
    336 F.3d 94  (2d Cir. 2003) ................................................................................... 23

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) .............................................................................................. 10

*Buckley v. O'Hanlon*,
    2007 U.S. Dist. LEXIS 22211 (D. Del. Mar. 28, 2007) ......................................... 21

*Coleman v. Newborn*,
    948 A.2d 422 (Del. Ch. 2007) ............................................................................... 28

*Collins & Aikman Corp. v. Stockman*,
    2009 U.S. Dist. LEXIS 43472 (D. Del. May 20, 2009) ......................................... 27

*Craftmatic Secs. Litig. v. Kraftow,*
   890 F.2d 628 (3d Cir. 1989) ........................................................................ 7, 10

*Davenport v. Burke,*
   167 P. 481 (Idaho 1917) ...................................................................................... 28

*Doherty v. Am. Motors Corp.,*
   728 F.2d 334 (6th Cir. 1984) ............................................................................... 17

*Eisenberg v. Feiner (In re Ahead By A Length, Inc.),*
   100 B.R. 157 (Bankr. S.D.N.Y. 1989) ............................................................ 8, 11

*Fibertection v. Jensen,*
   2007 U.S. Dist. LEXIS 90023 (D. Idaho Dec. 5, 2007) ...................................... 17

*Floyd v. CIBC World Markets, Inc.,*
   426 B.R. 622 (S.D. Tex. 2009) ...................................................................... 24, 25

*Ford Motor Co. v. Edgewood Props., Inc.,*
   2009 U.S. Dist. LEXIS 4172 (D.N.J. Jan. 20, 2009) .......................................... 10

*Forman v. Salzano (In re Norvergence, Inc.),*
   405 B.R. 709 (Bankr. D.N.J. 2009) .................................................................... 23

*Franks v. Food Ingredients Int'l, Inc.,*
   2010 U.S. Dist. LEXIS 77280 (E.D. Pa. July 30, 2010) ...................................... 10

*GLM Corp. v. Klein,*
   684 F. Supp. 1242 (S.D.N.Y. 1988) ................................................................... 12

*Graboff v. The Collern Firm,*
   2010 U.S. Dist. LEXIS 118732 (E.D. Pa. Nov. 8, 2010) ..................................... 13

*Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.),*
   32 B.R. 199 (Bankr. S.D.N.Y. 1983) ........................................................... 7, 8, 10

*Hill v. Day (In re Today's Destiny, Inc.),*
   388 B.R. 737 (Bankr. S.D. Tex. 2008) ........................................................... 24, 25

*Hogg v. Walker,*
   622 A.2d 648 (Del. 1993) .................................................................................... 28

*In re Brown Sch.,*
   386 B.R. 37 (Bankr. D. Del. 2008) ..................................................................... 21

*In re Burlington Coat Factory Secs. Litig.,*
   114 F.3d 1410 (3d Cir. 1997) .............................................................................. 11

*In re Citx Corp.,*
   448 F.3d 672 (3d Cir. 2006) ................................................................................................. 21

*In re GM S'holder Litig.,*
   2005 Del. Ch. LEXIS 65 (Del. Ch. May 4, 2005) ................................................................ 19

*In re Healthsouth Corp. S'holders Litig.,*
   845 A.2d 1096 (Del. Ch. 2003) ........................................................................................... 22

*In re Le-Nature's, Inc.,*
   2009 U.S. Dist. LEXIS 85073 ............................................................................................. 16

*In re Murrell,*
   2004 Bankr. LEXIS 1276 (Bankr. D. Idaho Aug. 12, 2004) ............................................... 29

*Institutional Investors Group v. Avaya,*
   564 F.3d 242 (3d Cir. 2009) ............................................................................................ 2, 11

*Jackson Nat'l Life Ins. Co. v. Kennedy,*
   741 A.2d 377 (Del. Ch. 1999) ............................................................................................. 19

*King's Place, Inc. v. First Nat'l Bank of Strasburg (In re King's Place, Inc.),*
   6 B.R. 305 (Bankr. E.D. Pa. 1980) ........................................................................................ 8

*Kirchner v. McAninley,*
   2011 Va. Cir. LEXIS 27 (Va. Cir. Ct. Mar. 14, 2011) ........................................................ 19

*L. A. Partners, L.P. v. Allegis Corp.,*
   1987 Del. Ch. LEXIS 501 (Del. Ch. Oct. 22, 1987) ............................................................ 19

*La Voy Supply Co. v. Young,*
   369 P.2d 45 (Idaho 1962) .................................................................................................... 29

*Lum v. Bank of Am.,*
   361 F.3d 217 (3d Cir. 2004) .................................................................................................. 9

*Luria v. Board of Dirs.,*
   672 S.E.2d 837 (Va. 2009) ................................................................................................... 29

*Marshall v. Fredericksburg Lumber Co.,*
   162 Va. 136 (1934) .............................................................................................................. 29

*Matrixx Initiatives, Inc. v. Siracusano,*
   131 S. Ct. 1309 (2011) ........................................................................................................... 6

*McHale v. Citibank, N.A. (In re 1031 Tax Group, L.L.C.),*
   420 B.R. 178 (Bankr. S.D.N.Y. 2009) ................................................................................... 7

*Milbank v. Holmes (In re TOCFHBI, Inc.)*,
    413 B.R. 523 (Bankr. N.D. Tex. 2009) ............................................................... 24, 25

*Minerals Dev. & Supply Co. v. Hunton & Williams, LLP*,
    2011 U.S. Dist. LEXIS 113814 (W.D. Wis. Sept. 30, 2011) .................................... 17

*Morgan v. Cash*,
    2010 Del. Ch. LEXIS 148 (Del. Ch. July 16, 2010) ............................................... 19

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*,
    361 B.R. 369 (Bankr. S.D.N.Y. 2007) ................................................................... 29

*Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*,
    267 F.3d 340 (3d Cir. 2001) ..................................................... 22, 23, 24, 26

*OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*,
    340 B.R. 510 (Bankr. D. Del. 2006) ...................................................................... 22

*Pardo v. Gonzaba*,
    308 B.R. 183 (Bankr. D. Del. 2004) ........................................................................ 9

*Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*,
    421 B.R. 626 (Bankr. S.D.N.Y. 2009) ................................................................... 30

*Pereira v. United States*,
    347 U.S. 1 (1954) .................................................................................................. 12

*Picard v. Taylor (In re Park S. Sec., LLC)*,
    326 B.R. 505 (S.D.N.Y. 2005) .............................................................................. 29

*Pinter v. Dahl*,
    486 U.S. 622 (1988) .............................................................................................. 21

*Quilling v. Stark*,
    2006 WL 1683442 (N.D. Tex. June 19, 2006) ....................................................... 30

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) .......................................................... 13, 14, 15, 16

*Rock City Sound, Inc. v. Bashian & Farber, LLP*,
    903 N.Y.S.2d 517 (App. Div. 2d Dep't 2010) ....................................................... 18

*S.E.C. v. Edwards*,
    540 U.S. 389 (2004) .............................................................................................. 27

*S.E.C. v. Howey*,
    328 U.S. 293 (1946) .................................................................................... 26, 27

*S.F. Residence Club, Inc. v. Amado,*
  2011 U.S. Dist. LEXIS 19230 (N.D. Cal. Feb. 25, 2011) ........................................ 28

*Scheinman v. Martin's Bulk Milk Serv., Inc.,*
  2011 U.S. Dist. LEXIS 40701 (N.D. Ill. Apr. 12, 2011) ........................................... 7

*Schmuck v. United States,*
  489 U.S. 705 (1989) ................................................................................................. 12

*Secs. Investor Prot. Corp. v. Stratton Oakmont, Inc.,*
  234 B.R. 293 (Bankr. S.D.N.Y. 1999) ............................................................... 7, 10

*Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.),*
  84 F.3d 1281 (10th Cir. 1996) ................................................................................ 26

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,*
  742 F.2d 786 (3d Cir. 1984) ........................................................................ 8, 10, 30

*Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.),*
  2007 Bankr. LEXIS 4708 (Bankr. S.D. Tex. May 3, 2007) .................................... 25

*Springel v. Hotel Plaza Athenee (In re Innovative Commun. Corp.),*
  2010 Bankr. LEXIS 2297 (Bankr. D.V.I. June 18, 2010) ...................................... 30

*Sulik v. Central Valley Farms,*
  521 P.2d 144 (Idaho 1974) ...................................................................................... 22

*Tate v. Commercial Bldg. Assoc.,*
  97 Va. 74 (Va. 1899) ............................................................................................... 25

*Taylor v. McNichols,*
  243 P.3d 642 (Idaho 2010) .............................................................................. 17, 29

*Thomas v. Bd. of Educ.,*
  759 F. Supp. 2d 477 (D. Del. 2010) ........................................................................ 28

*United States v. Carman,*
  577 F.2d 556 (9th Cir. 1978) .................................................................................. 27

*United States v. Cummings,*
  395 F.3d 392 (7th Cir. 2005) .................................................................................. 15

*United States v. Darden,*
  70 F.3d 1507 (8th Cir. 1995) .................................................................................. 15

*United States v. Frey,*
  42 F.3d 795 (3d Cir. 1994) ...................................................................................... 12

*United States v. Griffith*,
   17 F.3d 865 (6th Cir. 1994) ................................................................................. 12

*United States v. Maze*,
   414 U.S. 395 (1974) ............................................................................................. 12

*United States v. McGeehan*,
   584 F.3d 560 (3d Cir. 2009) .................................................................................. 9

*United States v. Oreto*,
   37 F.3d 739 (1st Cir. 1994) .................................................................................. 15

*United States v. Parise*,
   159 F.3d 790 (3d Cir. 1998) ................................................................................ 15

*United States v. Shifman*,
   124 F.3d 31 (1st Cir. 1997) .................................................................................. 15

*United States v. Tiller*,
   302 F.3d 98 (3d Cir. 2002) ................................................................................... 12

*United States v. Urban*,
   404 F.3d 754 (3d Cir. 2005) ................................................................................ 14

*University of Maryland v. Peat, Marwick, Main & Co.*,
   996 F.2d 1534 (3d Cir. 1993) .............................................................................. 16

*Va. Surety Co., Inc. v. Macedo*,
   2010 U.S. Dist. LEXIS 88720 (D.N.J. Aug. 27, 2010) ....................................... 11

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
   901 A.2d 106 (Del. 2006) .................................................................................... 28

*Witt v. Jones*,
   722 P.2d 474 (Idaho 1986) ................................................................................... 28

*Wyant v. Corr. Med. Servs.*,
   2005 U.S. Dist. LEXIS 26103 (D. Del. Nov. 1, 2005) .......................................... 7

*Zazzali v. Mott (In re DBSI, Inc.)*,
   445 B.R. 344 (Bankr. D. Del. 2011) .................................................................... 29

*Zazzali v. Swenson (In re DBSI Inc.)*,
   2011 Bankr. LEXIS 1677 (Bankr. D. Del. May 5, 2011) ............................. 7, 9, 21

*Zazzali v. Wavetronix LLC*,
   445 B.R. 351 (Bankr. D. Del. 2011) .................................................................... 18

## **STATUTES**

I.R.C. § 1031 ................................................................................................ 4, 27

Idaho Code Ann. § 18-7803(a) ........................................................................ 13

Idaho Code Ann. § 18-7803(a)(16) ................................................................. 13

Idaho Code Ann. §18-1906 ............................................................................. 13

## **OTHER AUTHORITIES**

Christopher W. Madel, *The Modern RICO Enterprise:  The Inoperation and
    Mismanagement of Reves v. Ernst & Young,*
    71 Tul. L. Rev. 1133, 1190-91 (1997) ..................................................... 16

James W. Moore et al.,
    *Moore's Federal Practice - Civil,* ¶ 9.03[1][g] at 9-33 (3d ed. 1987) ........ 8

R. Silbergleid, *Don't Throw Away Your Deepening Insolvency Materials Just Yet,*
    27-8 ABIJ 28, 63 (Am. Bankr. J. Oct. 2008) .......................................... 21

## **RULES**

Fed. R. Civ. P. 12 ........................................................................................... 6

Fed. R. Civ. P. 12(b)(6) ............................................................................... 1, 3

Fed. R. Civ. P. 8 ............................................................................................. 3

Fed. R. Civ. P. 9 ............................................................................................. 3

James R. Zazzali, as trustee of the DBSI Estate Litigation Trust and as trustee of the DBSI Private Actions Trust (the "Trustee"), submits this memorandum of law in opposition to the motion of Defendant Hirschler Fleischer, P.C. ("Hirschler") to dismiss the Complaint in this matter pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").

## PRELIMINARY STATEMENT

As the Trustee has explained many times, DBSI was a massive Ponzi scheme involving commercial real estate investments throughout the United States. When the scheme collapsed in 2008, over ten thousand victims learned that they had lost their savings. The primary vehicle for the fraud were Private Placement Memoranda ("PPMs") that permitted the sale of tenant-in-common ("TIC") interests in real estate for tax avoidance purposes under Regulation D. The PPMs were replete with falsehoods, including wild over statements of DBSI's net worth, false histories of DBSI's investments, and deceptive language regarding the intended use of investors' reserve funds.

Hirschler drafted all of the PPMs from the very first one used by DBSI in 2004 up until 2006. Subsequent PPMs were modeled upon the Hirschler PPMs. Hirschler also assisted in structuring DBSI affiliates to present a fraudulent picture of solvency to the world. Hirschler put its expertise and its reputation in the service of DBSI and the DBSI debacle could never have taken place without it. The centrality and pervasiveness of Hirschler's involvement in DBSI, all of which are pled in the Complaint, create an ample and persuasive inference that Hirschler was aware of the nature of DBSI from the inception of their relationship. This knowledge is directly alleged in the Complaint and the facts set forth there make those allegations more than simply plausible. Indeed, it is the contrary proposition-that Hirschler was an unwitting scrivenor-that tests the bounds of plausibility.

Many of Hirschler's contentions are not properly raised on this motion. For example, Hirschler asks the Court to opine that it is not credible that a Virginia law firm would engage in a fraud with an Idaho company simply for a legal fee. This is plainly for the trier of fact. Hirschler's

arguments based upon the Trustee's supposed access to evidence are remarkably unfair.  The Bankruptcy Examiner's investigation actually found that DBSI was so complex that it could never be completely understood; indeed, that the transactions were willfully structured to conceal the economic reality of them.  In any event, the Trustee's prosecution of claims serve completely different ends from the Examiner's investigation and the evidence collected, much of it unsworn and even untranscribed interviews, are not necessarily useful for the Trustee's purpose here.  The purely legal points raised in this Motion, such as Hirschler's *in pari delicto* argument, amount, for the most part, to defenses for which Hirschler has the burden of proof as this case progresses.  The securities fraud exception to RICO will involve disputed, multi-factor factual issues.

Even the facts set forth in the first two paragraphs of this section, let alone those alleged in the 45-page complaint (plus appended schedules), tell this story with all the "plausibility" required by *Twombly* and its progeny.  This is particularly so in light of the substantial authority that exists holding that a trustee in this situation is not held to the same standards of pleading as a private litigant.  The Third Circuit has been clear that the pleadings in a complaint are to be judged as a whole, and the pleading's viability assessed "not on the presence or absence of certain types of allegations but on a practical judgment...accepting the whole factual picture painted by the Complaint[.]"  *Institutional Investors Group v. Avaya,* 564 F.3d 242, 269 (3d Cir. 2009).

The DBSI fraud was massive.  Hirschler was at ground zero.  Hirschler's contention that it need not even answer a complaint based on this involvement is remarkable, particularly when Hirschler's attorneys themselves are the most definitive source of information regarding the firm's deep, extended and intimate involvement with the DBSI fraud.

## STATEMENT OF NATURE OF PROCEEDINGS

James R. Zazzali brings this action, as trustee of two different trusts:  the DBSI Estate Litigation Trust and as trustee of the DBSI Private Actions Trust.  Defendant Hirschler has moved

pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Complaint against it.

## SUMMARY OF ARGUMENT

1.    The various causes of action are pled in sufficient detail to pass muster under Fed. R. Civ. P. 8 and 9, the case law interpreting those Rules, and the special application of those Rules to trustees.

2.    Issues raised, such as choice of law, are premature on this motion.  The *in pari delicto* doctrine should not be applied here.  The facts do not require it and the public policy implications weigh strongly against it.  Even if the doctrine was applied, the adverse interest exception takes this case outside its reach.

3.    The RICO claims state valid causes of action.  The securities fraud exception does not apply, because much of the activity alleged does not sound in securities fraud.  Hirschler's past statements estop it from claiming as a matter of law that the securities fraud exception applies.  The Complaint adequately alleges that Hirschler "conducted" the affairs of the enterprise.

4.    The Complaint adequately alleges actual and constructive fraudulent conveyance.

## FACTUAL BACKGROUND

A few short years ago, the DBSI Companies Inc. and its affiliated companies (collectively "DBSI Companies" or "DBSI") presented to the world an illusion of a monolith of wealth, competence and power.  In offering materials, principally PPMs drafted by Hirschler, Investors were told of substantial commercial real estate holdings throughout the country, of successful and sophisticated real estate ventures, and that no DBSI Investor had ever lost money.  Comp. ¶ 1.

This monolith was a fake.  Obligations to Investors had outstripped receipts for years.  The business plan was a sham.  The companies were kept alive, not with any real expectation that they would turn a corner, but because they provided a vehicle for defrauding Investors.  Hundreds of empty or half-formed entities passed assets back and forth to falsely preserve the impression of solvency.  Assets were not as represented or were leveraged far in excess of covenants.  Positive cash flow came only from new Investor money, which was used to pay off old Investors--a Ponzi

scheme.  Investor funds that were supposed to be reserved for specific purposes, the so-called

Accountable Reserves, were dissipated.  The Accountable Reserves alone represent over $80 million

in lost funds.  *Id.* ¶¶ 2-3.  From 2004, DBSI operated unattached from rational economic moorings.

DBSI's purported investment product was tenant-in-common ("TIC") interests in

commercial real estate properties as a tax avoidance strategy pursuant to I.R.C. § 1031.  The TIC

property was leased to a DBSI affiliate-master lessor which was subleased to the tenant.  As an

inducement, DBSI guaranteed the rent stream to the TIC Investors.  *Id.* ¶ 83.  Rents from sublessees

did not, however, cover both the rent owed to the TIC Investors and the debt service.  Thus

operations of the underlying properties could not support DBSI's guarantee obligations.  *Id.* ¶ 43.

As the TIC syndication business failed, the Insiders raised cash from, *inter alia*, new TIC

syndications of properties bought for sums well in excess of market value.  DBSI Inc.'s guarantees

were sold on the representation that DBSI Inc. had substantial value, even as newly raised Investors'

funds were being used to pay off existing Investors.  *Id.* ¶ 201.  Financials were knowingly outright

false.  *Id.*¶¶ 67-78; 96.

The use of FOR 1031 LLC ("FOR 1031"), owned by Insiders Douglas Swenson and Thomas

Var Reeve, exacerbated the deception.  FOR 1031 guaranteed the rent proceeds through the master

lease structure, but the guaranteed investment return was provided by other DBSI entities -- initially

DBSI Inc. and later DBSI Master Leaseco ("Master Leaseco").  FOR 1031's agreements with DBSI,

and Master Leaseco were not at arm's length and no reasonable third-party would have agreed to

assume these guaranty liabilities and other obligations.  These liabilities borne were substantial

because the real estate assets purchased by FOR 1031 and its subsidiaries were substandard,

incapable of producing reliable revenue, and financially insecure.  *Id.* ¶¶ 81-93.  The master tenant

also paid the expenses associated with capital improvements and tenant improvements on TIC

property.  In short, DBSI Master Leaseco, bore, in full, the losses the TIC properties suffered under

the master lease structure and FOR 1031's apparent financial health was fiction and illusion.  FOR 1031's Insider owners enjoyed all of the profits from the TIC syndications.  In reality, however, because liabilities were off-balance sheet, FOR 1031 was insolvent beginning no later than 2005.  *Id.*

The Accountable Reserves were collected from investors pursuant to the PPMs which represented that the funds would be restricted to property improvements, taxes, insurance and the like.  In reality, the Insiders treated Accountable Reserves as ready cash.  *Id.* ¶¶ 32-66.  By August 15, 2005, Accountable Reserves were collected in connection with almost every real estate project sold by the DBSI Companies.  *Id.*  Only approximately $18 million of the Accountable Reserves funds were used as represented.  Approximately $82 million of Accountable Reserves funds were spent for unauthorized purposes, including, misappropriation by the Insiders.  *Id.* ¶¶ 51-52.

The Complaint alleges that the Insiders' fraud was perpetrated with the conscious assistance and involvement of Hirschler, which was deeply entrenched in DBSI's affairs.  *Id.* ¶¶ 26-30.  The primary mechanism by which the scheme was conducted was the PPMs.  Beginning in 2004, and continuing up to some time in 2006, Hirschler Fleischer drafted all of the PPMs used by DBSI in connection with their TIC syndications or provided material and substantial advice to DBSI regarding the drafting of PPMs.  Id. ¶¶ 28-29.[1]  After 2006, DBSI PPMs continued to use misleading language drafted by Hirschler, as the firm knew and intended would occur.  *Id.* ¶ 79.  The firm, through its lawyers including John Ramey, advised on the handling of the Accountable Reserves.  *Id.* ¶ 65.  In the PPMs, investors were falsely assured that the Accountable Reserves would be used to maintain or improve the property during the master lease and avoid the necessity of additional contributions.  *Id.* ¶ 41.  Hirschler's PPMs led investors to believe that the Accountable Reserves would be kept separate and secure for permitted uses or returned to the Investors to the extent

---

[1] Charts identifying the various fraudulent and misleading Accountable Reserves PPM language drafted and/or reviewed by Hirschler are attached to the Complaint as Exhibits A and B.

unused.  *Id.* ¶ 43.

Furthermore, Hirschler knew of and was aware that the statements by DBSI regarding the tax status of the Accountable Reserves would mislead and did mislead investors by causing them to believe that the Accountable Reserves would be kept separate and available for the permitted uses or for return to the Investors to the extent unused.  Id. ¶ 60.  Hirschler advised DBSI and the Insiders regarding the structure of the DBSI enterprise, including the FOR 1031/Master Leaseco/DBSI guarantor structure, which was designed to deceive Investors, present a false picture of FOR 1031's financial health to the public and permit the Insiders to misappropriate corporate receipts.  Finally, by representing both DBSI and FOR 1031, Hirschler acted under a conflict of interest, including without limitation that obligations were transferred to DBSI and assets were transferred to FOR 1031 in derogation of the fiduciary duties of the officers and directors of DBSI, without reasonable exchange of value, and for the purposes of defrauding Investors.  *Id.* ¶¶ 81-93.

## DISCUSSION

I.    **The Complaint Satisfies the Basic Threshold for Pleading**

Rule 12 requires that a complaint plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  Very recently, in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011), the Supreme Court revisited the *Twombly* standard in a business case, providing useful guidance in applying Rule 12 in this context.  In *Matrixx,* the High Court sustained a complaint alleging securities fraud, holding that the facts pled must merely "'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" and "'raise a reasonable expectation that discovery will reveal evidence[.]'"  *Id.* at 1323 (quoting *Iqbal,* 129 S. Ct. at 1940; *Twombly,* 550 U.S. at 556).  For this purpose, the complaint is to be read as a whole.  *Id.* at 1324 (allegations taken "collectively").

The Complaint easily surmounts this basic threshold, particularly in the context of this long-

6

running and complex fraud.  *See McHale v. Citibank, N.A. (In re 1031 Tax Group, L.L.C.)*, 420 B.R. 178, 191 (Bankr. S.D.N.Y. 2009) ("As the complexity and duration of the alleged fraud increases, courts afford bankruptcy trustees additional pleading flexibility."); *Secs. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310-11 (Bankr. S.D.N.Y. 1999) (trustee given "greater latitude" in cause of action involving "complicated issues and transactions which extend over lengthy periods of time").  Clearly, the Trustee has alleged "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" required by the Supreme Court.  *Iqbal,* 129 S. Ct. at 1949.

Moreover, a substantial body of law holds that Rule 9 may be relaxed in cases involving trustees, bankruptcy, and very complex, large cases involving fraud.  Judge Walsh of the Bankruptcy Court in this very case held, "Rule 9's requirements, however, are relaxed in the bankruptcy context, particularly in cases such as the present in which a trustee has been appointed." *Zazzali v. Swenson (In re DBSI Inc.)*, 2011 Bankr. LEXIS 1677, at *7 (Bankr. D. Del. May 5, 2011); *see also Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.)*, 32 B.R. 199, 203 (Bankr. S.D.N.Y. 1983) ("[T]his liberality is required because it is often the Trustee, a third party outsider to the fraudulent transaction, that must plead fraud on secondhand knowledge for the benefit of the estate and all of its creditors.").  The Third Circuit has noted that courts will relax Rule 9(b) when information is within control of the defendants:  "rigid enforcement in such circumstances could permit sophisticated defrauders to avoid liability." *Craftmatic Secs. Litig. v. Kraftow*, 890 F.2d 628, 645 (3d Cir. 1989). In such cases, a trustee will often be unable to allege facts that exist, are discoverable, and would support a valid claim.  *See, e.g.*, *Wyant v. Corr. Med. Servs.*, 2005 U.S. Dist. LEXIS 26103, at *11 (D. Del. Nov. 1, 2005) (denying motion to dismiss to permit discovery); *Scheinman v. Martin's Bulk Milk Serv., Inc.*, 2011 U.S. Dist. LEXIS 40701, at *8-9 (N.D. Ill. Apr. 12, 2011) (discovery allowed where plaintiff could not provide more specific allegations without it).

Rule 9(b) is intended to prevent the filing of a complaint as a pretext for discovery of

unknown wrongs.  James W. Moore et al., *Moore's Federal Practice - Civil*, ¶ 9.03[1][g] at 9-33 (3d ed. 1987).  Conversely, the courts reject a defendant's invocation of Rule 9(b) where "[t]he Amended Complaint is far from a pretext for discovery, describing in detail a fraudulent scheme for bilking the debtor and its creditors of large sums of money . . . ."  *Eisenberg v. Feiner (In re Ahead By A Length, Inc.)*, 100 B.R. 157, 167 (Bankr. S.D.N.Y. 1989).  In these circumstances, Rule 9(b) only requires that the complaint "'set forth the facts with sufficient particularity to apprise the defendant fairly of the charges made against him . . . so that the defendant can prepare an adequate answer to the allegations.'"  *O.P.M. Leasing*, 32 B.R. at 203 (quoting *King's Place, Inc. v. First Nat'l Bank of Strasburg (In re King's Place, Inc.)*, 6 B.R. 305, 307-08 (Bankr. E.D. Pa. 1980)).  A plaintiff may utilize "alternative means of injecting precision and some measure of substantiation" into a fraud allegation.  *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).  No reasonable claim can be made that the Complaint is pretextual or fails to apprise Hirschler of the charges made against it.  Hirschler's protestations of non-involvement are issues for discovery and trial.

### A.    The Complaint Contains Sufficient Factual Allegations

A recurring theme of the Motion to Dismiss is that the Trustee failed to plead sufficient facts to support one or another element of the causes of action.  Hirschler would have the Court ignore specific allegations that do appear and the overall picture painted by the pleading, while advancing straw man allegations that Hirschler erroneously claims are essential but missing.

### 1.    Investor Reliance

It is not true that the Complaint fails to allege that "any investor" relied upon a PPM drafted by Hirschler.  (Brf. at 9.)  The PPMs themselves state (and Regulation D requires) that every investor certify that she or he read and relied upon the PPMs *and nothing else.*  Comp. ¶ 27, 39; Declaration of Debra A. Clifford, Esq. ("Clifford Decl.") Exh. A (sample pages of Hirschler-drafted

8

PPM).[2]  It is alleged that *every* PPM was drafted by Hirschler up until 2006 and specific PPMs either

drafted or reviewed by Hirschler are listed.  Comp. Exh. A.  Post-2006, Hirschler-drafted PPMs

continued to harm investors.  *Id.* ¶¶ 78-80.  All or nearly all of the real estate transactions DBSI

entered into employed the Accountable Reserve fraudulent device, *id.* ¶ 40, which Hirschler helped

devise and for which Hirschler crafted deceptive language in the PPMs.  Id. ¶¶ 36, 41, 45.  As a

matter of logic, the Assigning Investors include those that relied on Hirschler PPMs.

> ### 2.    RICO Predicate Acts

Likewise without merit is Hirschler's contention that the Trustee failed to plead facts

supporting a RICO predicate act.  The individual acts of mail or wire fraud are so many that they

must be listed in a table.  *Zazzali v. Swenson*, Civ. No. 10-950 [Doc. No. 62 (First Amended

Complaint) at Exs. F-H].  Hirschler cannot deny that they took place nor that it has notice of them.

Of course allegations of mail and/or wire fraud as a basis for a RICO violation must comply with

Fed. R. Civ. P. 9(b).  *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004).[3]  But, as even Hirschler

concedes, those statutes require only "(1) the defendant's knowing and willful participation in a

scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or

interstate wire communications in furtherance of the scheme."  *United States v. McGeehan*, 584 F.3d

560, 565 (3d Cir. 2009) (quotation omitted).  Reliance, though amply alleged here, need not be

shown to plead RICO allegations.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 641-42

---

[2] This document is properly considered on this Motion as a document on which the Complaint is based.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (U.S. 2007).

[3] It is discussed *supra* that the requirements of Rule 9 may be relaxed in cases involving trustees, bankruptcy, and very complex, large cases involving fraud.  As noted, this rule has already been applied in this very case.  *DBSI*, 2011 Bankr. LEXIS 1677, at *7; *see also Pardo v. Gonzaba*, 308 B.R. 183, 188 (Bankr. D. Del. 2004) (noting that "in the bankruptcy context, Rule 9(b) should be interpreted liberally, particularly when the trustee . . . is bringing the action") (internal quotations and citation omitted)).

(2008).[4]

In "complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the 'temporal or geographic particulars of each mailing made in furtherance of the fraudulent scheme be stated with particularity,' but only that the 'plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme.'" *Allstate Ins. Co. v. Etienne*, 2010 U.S. Dist. LEXIS 113995, at *27-28 (E.D.N.Y. Oct. 22, 2010) (internal citations omitted).  Moreover, while Rule 9(b)'s particularity requirement may be satisfied by pleading allegations of date, time and place of the mailings and/or emails, "'nothing in the rule requires them.'"  *Franks v. Food Ingredients Int'l, Inc.*, 2010 U.S. Dist. LEXIS 77280, at *15-16 (E.D. Pa. July 30, 2010) (quoting *Seville*, 742 F.2d at 791); *see also Ford Motor Co. v. Edgewood Props., Inc.*, 2009 U.S. Dist. LEXIS 4172, at * 57-58 (D.N.J. Jan. 20, 2009) ("focusing exclusively on [Rule 9's] 'particularity' language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules").

The admonition of *S.I.P.C. v. Stratton Oakmont, Inc.* is particularly apt.  "When the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time, the trustee's handicap increases and courts, therefore, should afford him or her even greater latitude." 234 B.R. at 310-11 (Bankr. S.D.N.Y. 1999).  Here, the Trustee appears to vindicate the interests of thousands of innocent victims; "liberality is required because it is often the Trustee, a third party outsider to the fraudulent transaction, that must plead fraud on secondhand knowledge for the benefit of the estate and all of its creditors."  *O.P.M. Leasing*, 32 B.R. at 203; *see also Craftmatic*, 890 F.2d at 645 ("[w]e agree that rigid enforcement in such circumstances could permit 'sophisticated defrauders' to avoid liability").

---

[4]  Nevertheless, as noted above, Investors did directly rely on Defendants' fraudulent conduct and the Trustee has pled facts sufficient to show such first-party reliance.

This is not an instance of pleading unknown wrongs warned of in the caselaw.  *Cf. Ahead By A Length*, 100 B.R. at 167-68 ("Complaint is far from a pretext for discovery, describing in detail a fraudulent scheme for bilking the debtor and its creditors of large sums of money . . . .").  The Complaint describes how the Insiders operated their Ponzi scheme and how Hirschler acted with them to consummate it.  Hirschler is alleged to have assisted in structuring the DBSI entities such that they would deceive Investors and facilitate the Insider's misappropriation.  Hirschler is alleged to have drafted, reviewed and/or approved the fraudulent PPMs, including the Accountable Reserves language.  *See, e.g.*, Comp. ¶¶ 22, 26, 29, 30, 36 - 39.

A plaintiff "must still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.'"  *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (securities); *Va. Surety Co., Inc. v. Macedo*, 2010 U.S. Dist. LEXIS 88720, at *19-20 (D.N.J. Aug. 27, 2010) (RICO).  But scienter may be pled generally.  Fed. R. Civ. P. 9(b).  Scienter may be pled with circumstantial facts and inferred from the totality of the allegations.  *Tellabs,* 127 S. Ct. at 2510 (scienter allegations "need not be irrefutable, *i.e.,* of the 'smoking gun' genre"); *Avaya,* 564 F.3d at 269 (scienter allegations evaluated under totality-of-the-circumstances test).

The basis for inferring scienter in this case is the close relationship between Hirschler and DBSI, the length of time Hirschler represented DBSI, and Hirschler's close involvement with the key events in creating the DBSI scheme.  It is alleged in the Complaint that Hirschler was well aware of what was going on at DBSI and that it enabled the Insiders to succeed at it for as long as they did.  *See, e.g.*, Comp. ¶¶ 28-39.  It is alleged repeatedly and the conclusion is inescapable from the facts that Hirschler was aware that it were assisting the Insiders in selling shares in an insolvent enterprise for years.  *See, e.g.*, *id.*  The Trustee has pled that Hirschler intentionally drafted the misleading Accountable Reserve language and material misstatements in the PPMs.  The firm gave advice on how to mislead investors as to the tax consequences of the transactions, *id.* ¶ 61, advised

on the deceptive FOR 1031 structure, *id.* ¶¶ 91, 93, and on how the Accountable Reserve concept should work. *Id.* ¶¶ 65-66. It is alleged that Hirschler knew that the DBSI business plan was economically impossible. *Id.* ¶ 87. In sum, Hirschler cannot avoid the inference from its long standing and close relationship with DBSI and its involvement in the actual instruments of the fraud that the firm knew of their wrongful and deceptive nature. *Id.* ¶¶ 30, 45, 60, 93.

Mail and wire fraud require only the use of the mails/wires in furtherance of the deceptive scheme. *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994). A defendant need not lick the envelope containing the fraudulent misstatement nor click "send" on the email with the misrepresentation. *United States v. Tiller*, 302 F.3d 98, 102 (3d Cir. 2002) ("[T]he defendant need not personally send the mailing or even intend that it be sent."). Use of the mails/wires is deemed "in furtherance of the scheme" if it was incidental to an essential part of it. *Frey*, 42 F.3d at 798. Use of the mail and/or wires need only have been reasonably foreseeable. *See United States v. Maze*, 414 U.S. 395, 399 (1974); *Pereira v. United States*, 347 U.S. 1, 9 (1954); *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (mailing need only be incident to "an essential element of the scheme.").

Here, the use of the mails and wires was at the heart of the scheme to dupe thousands of Investors across the United States. *See GLM Corp. v. Klein*, 684 F. Supp. 1242, 1246 (S.D.N.Y. 1988) ("[T]he use of the mails can be held to have been 'for the purpose of executing' an alleged fraudulent scheme if accomplishing the scheme's purpose could be found to have depended in some way on the information and documents which were passed through the mail."). Indeed, the necessary intent for mail and wire fraud is not the intent to use interstate mail or wires, but "the defendant's intent to engage in the scheme to defraud." *Tiller*, 302 F.3d at 102. The Complaint alleges specific acts of fraud in which Hirschler participated, including the preparation of PPMs and other materials used to market TIC and other DBSI investments which contained knowing

misstatements.  Comp. ¶¶ 28-39, 70-72.  In light of the foregoing, the predicate acts have been adequately pled.

The Trustee has likewise adequately pled the predicate acts under the Idaho Racketeering Act.[5]  That statute names as predicate acts "Fraudulent practices, false pretenses, insurance fraud, financial transaction card crimes and fraud generally."  Idaho Code Ann. § 18-7803(a).  Plainly, acts of mail and wire fraud fall within the categories of fraudulent practices/fraud generally.  Moreover, § 18-7803(a)(16) of the Idaho Code provides that a violation of § 18-1906, which includes the making of a false statement of a company's financial condition by its agent, is a predicate act.  Idaho Code Ann. §18-1906.[6]

### 3.    Conduct of a RICO Enterprise

Hirschler relies upon, but mischaracterizes, *Reves v. Ernst & Young*, 507 U.S. 170 (1993) to argue that RICO's "conduct of the enterprise" element is missing from the Complaint.  Defendant contends that *Reves* requires allegations detailing "control" of the RICO enterprise.  Hirschler Br. at 19-20.  This is borne out by neither *Reves* nor the Third Circuit authority that applies it.  *Reves* found that the Arthur Young accounting firm did not participate in the conduct of a RICO enterprise merely by providing "passive auditing functions" *see* 507 U.S. at 170 and failing to mention reservations regarding a shaky subsidiary set forth in a note to a written audit report.  *Id.* at 174-75.

---

[5] The Idaho Supreme Court has looked to the United States Supreme Court's interpretation of the federal RICO statute for guidance in applying Idaho's act.  *See Mannos*, 155 P.3d at 1175.  As such, the Idaho courts look to the federal RICO statute, which includes the predicate acts of mail and wire fraud, to interpret the Idaho racketeering act.

[6] Throughout their motion, Defendant conclusively assumes that either Idaho, Delaware or Virginia law applies, without any further analysis.  Choice of law questions are likely to be exceedingly complex in this lawsuit and there is no need for the Court to enter this thicket now.  "Due to the complexity of this analysis, when confronted with a choice of law issue at the motion to dismiss stage, courts within the Third Circuit have concluded that it is more appropriate to address the issue at a later stage in the proceedings."  *Graboff v. The Collern Firm*, 2010 U.S. Dist. LEXIS 118732, *21 (E.D. Pa. Nov. 8, 2010).

*Reves* parsed § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise . . . *to conduct or participate, directly or indirectly, in the conduct* of such enterprise's affairs through a pattern of racketeering activity . . . ." 507 U.S. at 177 (emphasis added).

*Reves* held only that a RICO defendant must have "participated in the operation or management of the enterprise . . . ." *Id.* at 183. The *Reves* Court expressly disavowed a rigorous 'control' requirement. *Id.* at 179 n.4 ("[W]e disagree with the suggestion of the [D.C. Circuit] that 1962(c) requires *significant control* over or within an enterprise.") (emphasis in original) (internal quotation omitted).

> Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

*Id.* at 179 (emphasis in original). The *Reves* Court took pains to state that executive authority is not necessary. "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184. Indeed, it is clear following *Reves* that a person need not have an official position within the enterprise; outsiders associated with the enterprise may also be liable, provided they "participate[d] in the conduct of *its* affairs." *Id.* at 185 (emphasis in original).

The Third Circuit's reading of *Reves* is in sharp distinction from Hirschler's spin on that case. "*Reves* thus 'made clear that RICO liability may extend to those who do not hold a managerial position within an enterprise, but who do nonetheless knowingly further the illegal aims of the enterprise by carrying out the directives of those in control.'" *United States v. Urban*, 404 F.3d 754, 770 (3d Cir. 2005) (necessary nexus between person and conduct of affairs of enterprise under § 1962(c) existed where city employed defendants to perform plumbing inspections and related work and the defendants did in fact perform that work) (quoting *Reves*, 507 U.S. at 184). "In applying

14

*Reves*, we have stated that the 'operation or management' test is designed to limit RICO liability under § 1962(c) to those situations in which the government can demonstrate a nexus between the person and the conduct in the affairs of an enterprise." *United States v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998) (internal quotation omitted) (affirming RICO conviction of defendant who bribed union employees because, even though defendant did not hold a formal position in the enterprise, he knew of the general nature of the enterprise and knew it extended beyond his individual role). The Third Circuit cited with approval the First Circuit's observation: "RICO liability extends to those 'plainly integral to carrying out' the enterprise's activities." *Id.* (quoting *United States v. Shifman*, 124 F.3d 31, 36 (1st Cir. 1997)); *see also United States v. Cummings*, 395 F.3d 392, 397-98 (7th Cir. 2005) (participation is not only operation or management of enterprise but includes facilitating the activities of those who do); *United States v. Darden*, 70 F.3d 1507, 1543 (8th Cir. 1995) (defendants could be held liable as operators and managers under § 1962(c), although acting under control of another individual); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994) (defendant may participate in conduct of an enterprise "by knowingly implementing decisions, as well as by making them").

The contrast between Hirschler's participation in the DBSI fraud and Arthur Young's activities in *Reves* is stark.  It is alleged that Hirschler was deeply entrenched in the affairs of DBSI, Comp. ¶ 126,  was involved with the inception of the master lease structure that ultimately doomed DBSI,  *id.* ¶¶ 3, 31, 91, and acted as the primary PPM drafter, an activity the First Circuit surely would have described as "integral" to the collection of the Accountable Reserves.  *Id. ¶¶* 22-60; *Shifman*, 124 F.3d at 36.  Hirschler undertook all of these activities while operating under grievous conflicts of interest.  *Id.* ¶ 92.  It was aware of the Ponzi-like nature of the DBSI business.  The firm assisted in devising the artifices to defraud Investors.  The firm knowingly and substantially aided the Insiders in looting corporate funds and tax advantages.  *Id.* ¶¶ 3, 22, 24, 26, 121 128.  Hirschler's

participation in the predicate acts of mail and wire fraud is plainly pled. *Id.* ¶¶ 128-132.

Hirschler's plaint that the Complaint alleges only that it provided "standard professional services" cannot stand. Hirschler Brf. at 19. *Reves* did not exempt professional service providers from participating in a RICO enterprise. *See* Christopher W. Madel, *The Modern RICO Enterprise: The Inoperation and Mismanagement of Reves v. Ernst & Young*, 71 Tul. L. Rev. 1133, 1190-91 (1997). *Reves* was careful to acknowledge that it did not purport to state where the line should be drawn, only that Arthur Young's accounting services did not cross it. 507 U.S. at 184 n.9 ("We need not decide in this case how far § 1962(c) extends down the ladder of operation . . . ."). Hirschler's citation of *University of Maryland v. Peat, Marwick, Main & Co.*, 996 F.2d 1534 (3d Cir. 1993) hardly helps it. The Court of Appeals wrote: "It cannot be said that by merely performing what are generic financial and related services to an insurance company, even if they are later found to be deficient, an accounting firm has opened itself to liability under the federal racketeering statute." *Id.* at 1539-40. Hirschler did not "merely" provide generic legal services. On the contrary, Hirschler was intimately and deeply involved in the fraudulent activities.

### 4. Conspiracy (RICO and Civil Conspiracy)

Hirschler argues that the necessary agreement to support the RICO and Civil Conspiracy counts has not been pled with sufficient particularity. The facts pled and reviewed above, however, refute this--Hirschler acted in concert with the Insiders (and not merely as the Insiders' representative). The allegations show Hirschler's knowledge of the fraud and Hirschler's active and necessary involvement in it. That Hirschler had formed an agreement with the Insiders is the only possible conclusion. *See In re Le-Nature's, Inc.*, 2009 U.S. Dist. LEXIS 85073, at *47-51 (denying motion to dismiss and finding it "plausible that Wachovia's alleged intentional disregard for the true financial condition of Le-Nature's and its alleged conscious efforts to withhold this information from the independent shareholders and facility Investors illustrates its intent to injure Le-Nature's").

16

The District Court of Idaho has "recognized [a civil conspiracy] cause of action under Idaho law, . . . [that] will be permitted if the underlying objective of the conspiracy is properly pled." *Fibertection v. Jensen*, 2007 U.S. Dist. LEXIS 90023, at *7 (D. Idaho Dec. 5, 2007). The Complaint has adequately pled the civil wrong that was the objective of the DBSI conspiracy -- the intentional and knowing misrepresentations aimed at masking the true financial condition of the DBSI companies to acquire new Investors to support a Ponzi scheme from which the Insiders personally benefited. Comp. ¶¶ 51-58, 72, 76-78, 101, 105, 108, 139-40; *see Mannos*, 155 P.3d at 1174.

The relationship between Hirschler, the Insiders and DBSI pled in the Complaint was not a simple agency relationship. Hirschler's contention that an agent or attorney cannot conspire with its principal or client is, therefore, misplaced. *Taylor v. McNichols*, 243 P.3d 642, 660 (Idaho 2010) (agent or attorney *acting within scope of the representation* cannot conspire with the principal). The Complaint alleges that the relationship, and the resulting conspiracy, were not within the scope of a normal attorney-client relationship between DBSI and Hirschler. Comp. ¶¶ 30, 126, 136 and 162. On the contrary, the conspiratorial relationship was between the Insiders and Hirschler and intended to benefit the Insiders (and Hirschler) at the expense of Hirschler's nominal client, DBSI. An alleged conspiracy to commit fraud, engaged to benefit the agent and co-conspirators that are not party to the attorney/client relationship is clearly outside the scope of Hirschler's legal representation of DBSI. *See, e.g., Doherty v. Am. Motors Corp.*, 728 F.2d 334, 339-40 (6th Cir. 1984) (concluding that if an attorney acts for personal gain, a conspiracy can be formed between an attorney and client); *Minerals Dev. & Supply Co. v. Hunton & Williams, LLP*, 2011 U.S. Dist. LEXIS 113814, at *31 (W.D. Wis. Sept. 30, 2011) (attorneys' "'immunity' does not apply when an attorney acts in a malicious, fraudulent or tortious manner which frustrates the administration of justice or to obtain something for the client to which the client is not justly entitled.").

17

5.    **Malpractice**

Hirschler argues that the Trustee has not said what the firm did that departed from the standard of professional care.  This is insupportable.  By way of example only, it is alleged that Hirschler drafted the Accountable Reserve language in such a way that it misled thousands of Investors regarding how these funds would be treated.  The Complaint details how Hirschler assisted Insiders with the master lease structure so that FOR 1031 would accrue all the advantages while other DBSI entities, also the firm's nominal clients, would be saddled with staggering obligations.  It is set forth in detail the extent to which Hirschler's breaches of professional duty allowed for the misappropriation of funds and for the fraudulent business model that led to DBSI's collapse and the loss of millions of dollars of Investors' money.  *See, e.g.*, *Rock City Sound, Inc. v. Bashian & Farber, LLP*, 903 N.Y.S.2d 517, 520 (App. Div. 2d Dep't 2010) ("by pleading the loss of its equipment, assets, and ability to continue in business, attributable in part to the defendants' legal advice, [the plaintiff] sufficiently pleaded allegations from which damages attributable to the defendants' malpractice might be reasonably inferred.").

Hirschler's argument rests in substantial part on the contention that Hirschler was unaware of the fraud.  The facts alleged showing Hirschler's awareness of the fraud have already been discussed several times.  Given the clear and compelling inference that Hirschler was aware of what was happening, its malpractice directed at DBSI amply alleged.[7]

6.    **Aiding and Abetting Breach of Fiduciary Duty and Fraud**

Hirschler's argument on this point rests on the same contention, already refuted *supra*, that Hirschler's knowledge of the fraud has not been pled sufficiently.  Hirschler Brf. Points VI(A),

---

[7] Defendants argue that in *Zazzali v. Wavetronix LLC*, 445 B.R. 351, 359-59 (Bankr. D. Del. 2011), the Court dismissed breach of fiduciary duty and unjust enrichment claims for failure to allege facts as required by Rule 8(a).  (Br. at 29.)  Interestingly, that Court recently held that the Amended Complaint adequately stated a claim for both breach of fiduciary duty and unjust enrichment. *Zazzali v. Wavetronix LLC*, 2011 Bankr. LEXIS 4127 (Bankr. D. Del. Oct. 31, 2011).

VI(B)(2), VI(D)(2).  Again, the circumstances of this very large and complex fraud and Hirschler's extended and crucial participation in it create an ample inference of Hirschler's knowledge. Hirschler claims that Virginia and Idaho law do not recognize a cause of action for aiding and abetting fraud, but it is far from clear that either of these States' law will govern.  Investors were located and defrauded throughout the United States and Delaware also has a significant relationship to this case.[8]

A third party's knowing participation may be inferred when deciding a motion to dismiss. *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 391-92 (Del. Ch. 1999) ("A claim of knowing participation need not be pleaded with particularity. . . . [Notably, however,] there must be some factual allegations from which knowing participation can be inferred.").  This obtains where the "activities . . . amount to more than simple arm's-length negotiations between the fiduciary and the non-fiduciary defendant, when supported by specific details about [the breach]." *Id.* at 393.  The Complaint discusses the relationship between DBSI and the many aspects of the DBSI business in which Hirschler was involved.  Comp. ¶¶ 26-30.  Here the Ponzi scheme was so elaborate that the circumstances would have "necessarily alert[ed]" Hirschler to DBSI's wrongful conduct.  *See L. A. Partners, L.P. v. Allegis Corp.*, 1987 Del. Ch. LEXIS 501, at *22 (Del. Ch. Oct. 22, 1987); *accord In re GM S'holder Litig.*, 2005 Del. Ch. LEXIS 65, at *95 (Del. Ch. May 4, 2005) (knowledge may be inferred where fiduciary's act "was *per se* illegal"); *Morgan v. Cash*, 2010 Del. Ch. LEXIS 148, *14 (Del. Ch. July 16, 2010) ("knowing participation may be inferred where the terms of the transaction are so egregious or the magnitude of the side deals is so excessive as to be inherently wrongful").

---

[8] Delaware law recognizes causes of action for aiding and abetting breach of fiduciary duty and fraud.  *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172 (Del. 2002).  In any event, if Virginia law does apply, Defendant could be found liable as a principal for fraud.  *See, e.g.*, *Kirchner v. McAninley*, 2011 Va. Cir. LEXIS 27, at *11 (Va. Cir. Ct. Mar. 14, 2011).

## II.     Hirschler's Legal Defenses are Invalid or Not Properly Raised On this Motion

### A.     The Insiders Harmed the DBSI Companies

Several of Hirschler's arguments rely on the surprising contention that the DBSI Companies were actually the beneficiaries of the Insiders and Hirschler's activities.  Hirsch. Brf. at 14-15 (DBSI not alleged to be a victim of RICO violations), *id.* at 12-13 (adverse interest exception to *in pari delicto* does not apply because DBSI benefited from fraud).  Hirschler attempts to misdirect the Court by alluding to the theory of deepening insolvency and claim that the Estate Trust's RICO claims are invalid for lack of harm.  None of these arguments are valid.

First, Hirschler would gloss over the fact that the Insiders misappropriated cash and tax benefits that belonged to DBSI.  The Insiders created the master lease structure for precisely this purpose, saddling DBSI entities with massive obligations while insulating funds received from investors in FOR 1031.  A charge of simple looting can not be explained away by claiming that the perpetrators were merely deepening the victim's insolvency.  There was no conceivable benefit to the DBSI entities in inducing the Investors to invest in what they (and Hirschler) knew was a Ponzi scheme, nor did the companies benefit when the Insiders and Hirschler caused them to break trust over the Accountable Reserve funds and dissipate those funds to prolong the fraud.

Thus, the Trustee need not rely on a deepening insolvency theory.  The Trustee has alleged that the Insiders and Hirschler kept the DBSI entities alive solely for use as a tool to defraud Investors with no hope that the money paid in would ever support a legitimate business.   On the contrary, that money was paid back out to meet Investor obligations or simply pocketed by the Insiders.  Hirschler's claim that this money benefited DBSI is wrong.

Of course, one measure of the entities' damages is the indebtedness visited upon the DBSI entities for no value received.  Hirschler mischaracterizes this theory as a discredited zone of insolvency theory.  The federal courts have held, subsequent to the *Trenwick* case cited by Hirschler, that increased indebtedness of an insolvent company can be a viable damages theory for an

independent tort.  *In re Brown Sch.,* 386 B.R. 37 (Bankr. D. Del. 2008).  Even the Third Circuit's *In re Citx Corp.* opinion, widely read as limiting the deepening insolvency theory, noted that "[w]here an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation."  448 F.3d 672, 678 (3d Cir. 2006).[9]  In fact, loss of money by a company, solvent or not, is a traditional type of damage, and whether it is characterized as deepening insolvency is semantics only.  R. Silbergleid, *Don't Throw Away Your Deepening Insolvency Materials Just Yet,* 27-8 ABIJ 28, 63 (Am. Bankr. J. Oct. 2008).

**B.    In Pari Delicto**

The validity of the *in pari delicto* defense cannot be decided on this motion.  *In pari delicto* is a judge-made, equitable doctrine that may provide a defense to a professional service provider for wrongdoing in which the plaintiff-client participated.  *See Pinter v. Dahl*, 486 U.S. 622, 632 (1988).  Even if Defendant was correct in its analysis, and it is not, this affirmative defense should not be grounds for dismissal at the pleading stage on these facts.  *See Buckley v. O'Hanlon*, 2007 U.S. Dist. LEXIS 22211, at *24 (D. Del. Mar. 28, 2007).

Central to the application of *in pari delicto* where a corporate entity sues its professionals is that the insiders' wrongdoing is imputed to the corporate entity.  Here, there are 59 consolidated debtor and non-debtor entities.  *See, Zazzali v. Swenson*, Civ. No. 10-950 (D. Del.) [Doc. No. 62-1 (Ex. A. to First Am. Comp.)].  Each of the Debtors was dragged into the wrongdoing of the Insiders, and Hirschler to a different degree, and each suffered a different amount and type of harm.  A sweeping application of *in pari delicto* as a matter of law at the pleading stage would inevitably be in error as to many or even most of the entities.  Indeed, it is public record that several entities had non-

---

[9] In response to the argument that *Citx* disapproved of deepening insolvency as a theory of damages, later cases have noted the other factors in that decision and limited *Citx* to those facts.  *In re Brown Sch.,* 386 B.R. 37 (Bankr. D. Del. 2008).

Insider officers or directors, and for other entities it is unclear who comprised their management. *See id.* One cannot determine now to which of the many Debtor entities the Insider's culpability should be imputed and thus impossible to determine whether *in pari delicto* even applies.[10]

Other fact issues are easily identified. For example, the *in pari delicto* defense cannot be raised by insider wrongdoers. *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 340 B.R. 510, 536 (Bankr. D. Del. 2006). The Trustee has pled (and it will ultimately have to be determined) that Hirschler was a direct participant and insider to the supposed wrongdoer entities. Comp. ¶ 126 ("deeply entrenched in scheme to defraud", "caused the Enterprise to issue the fraudulent PPMs") ¶ 30 ("intimately involved" in drafting fraudulent PPMs), ¶ 28 ("actively consulted and advised" as to fraud). Because Hirschler has been alleged to be an insider, dismissal on *in pari delicto* grounds is improper.

Whether the "adverse interest" exception to *in pari delicto* applies is also a fact question. The acts of directors and officers will not be imputed to the corporation where the conduct of the directors and officers is adverse to the corporation. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 359 (3d Cir. 2001). Idaho, Delaware and Virginia recognize the adverse interest exception. *See In re Healthsouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 n.22 (Del. Ch. 2003) ("When corporate fiduciaries . . . have a self-interest in concealing information -- such as the falsity of the financial statements that they had helped prepare -- their knowledge cannot be imputed to the corporation."); *Sulik v. Central Valley Farms*, 521 P.2d 144, 146 (Idaho 1974) (noting that "knowledge of the agent, acquired during the course of the agency relationship, and *while the agent is not acting in an interest adverse to that of the principal*, is imputed to the principal") (emphasis added); *Objective Interface Sys. v. Garrett*, 2006 U.S. Dist. LEXIS 79722, at

---

[10] As argued *infra,* the doctrine is not properly applied to a post-confirmation litigation trustee.

*10 (E.D. Va. Oct. 27, 2006) ("Both Virginia and California law recognize the adverse interest exception to the imputed knowledge doctrine."). Concealment of insolvency to facilitate management misconduct plainly falls within the adverse interest exception.

The Complaint alleges, in sum, that the Insiders kept the entities alive as insolvent shells for years after they had any economic viability, used the entities to defraud the public, looted them, and left them with hundreds of millions of indebtedness to investors. Plainly, this was 'adverse' to the entities. There was no hope or expectation that the entities would ever make a profit. Comp. ¶¶ 22-30. The real estate purchased could never support the DBSI edifice and financial disclosures were false. *Id.* ¶¶ 67-70, 89, 90, 93. The ostensible "clients," the DBSI entities, served as a vehicle for the Insiders' fraud on the public while they misappropriated for themselves any benefit accruing to the DBSI entities. The proposition that the companies themselves were the wrongdoers is error. The DBSI entities were the victims too.[11]

Ignoring the numerous factual issues involved, Hirschler relies on *Lafferty*, to argue that Counts One through Four are barred as a matter of law with respect to the Estate Litigation Trust's claims. 267 F.3d 340. *Lafferty* is not controlling here. In *Lafferty*, the issue was the application of *in pari delicto* against a bankruptcy trustee. *Id.* at 355. A bankruptcy trustee replaces the debtor as representative of the bankruptcy estate. *See id.* at 356. Despite the harsh result that flows from this

---

[11] Hirschler may argue that the "sole actor" exception negates the adverse interest exception. The sole actor exception provides that, in situations where the adverse interest exception would otherwise apply, an agent's misconduct adverse to the corporation can still be imputed to the corporation if that agent was the primary or unitary agent acting on behalf of the corporation. *See Lafferty*, 267 F.3d at 359. This creates yet further fact issues regarding the application of *in pari delicto.* "Innocent" decisionmakers and non-Insider officers and directors existed within certain of the debtor entities. *See Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group)*, 336 F.3d 94, 101 (2d Cir. 2003) ("imputation applies unless at least one decisionmaker in a management role or amongst the shareholders is innocent and could have stopped the fraud"). *See Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 747-49 (Bankr. D.N.J. 2009) (no *in pari delicto* dismissal where fact issues existed concerning imputation of fraudulent conduct to corporation).

reasoning, *see Lafferty*, 267 F.3d at 362-63 (Cowen, J., dissenting), it is at least logical that Chapter 11 trustees might be burdened with defenses arising from the debtor's culpability.

Such logic disappears, however, where the claimant is not a bankruptcy trustee representing the estate itself, but, rather, is a post-confirmation entity several steps removed from the usual wrongdoer against whom *in pari delicto* is properly raised. Obviously, James R. Zazzali did not participate in the DBSI fraud. Pursuant to the confirmed Chapter 11 plan in this case, he is simply the successor to claims for the ultimate benefit of creditors of the bankruptcy estate. Unlike *Lafferty*, the holder of the claims at issue is not an appointee under the Bankruptcy Code. Section 541(a), upon which the *Lafferty* court based its extremely technical holding, therefore does not compel the same result here. More fundamentally, *in pari delicto* is a defense personal to one wrongdoer against another; it is not part of the claim. It makes no sense to permit a wrongdoer to raise the defense against an innocent successor to the claim, particularly where the result is to frustrate recovery by the victims of the wrongdoing.

Several courts hold that *in pari delicto* cannot pose a threshold bar to the plaintiff's claims particularly where public policy weighs against it. *See Floyd v. CIBC World Markets, Inc.*, 426 B.R. 622, 642 (S.D. Tex. 2009) (dismissal of litigation trustee's claims for *in pari delicto* "premature because even in situations where the parties are found to be *in pari delicto*, under [applicable state law], relief will sometimes be granted if public policy demands it") (internal quotations and citation omitted); *Milbank v. Holmes (In re TOCFHBI, Inc.)*, 413 B.R. 523, 537 (Bankr. N.D. Tex. 2009) (refusing to dismiss because *in pari delicto* "is intensely factual" and requires policy analysis); *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737, 749 (Bankr. S.D. Tex. 2008) ("*in pari delicto* is not an automatic bar"; dismissal denied because court "must consider how the facts and equities of the individual case interact with the policy *in pari delicto* was designed to serve"); *Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)*, 2007 Bankr. LEXIS 4708, at *13 (Bankr. S.D. Tex.

24

May 3, 2007) ("Although the law provides that a bankruptcy trustee stands in the debtor's shoes, the Court cannot determine without a trial how to balance the respective equities that are demanded by [applicable state law] when an *in pari delicto* situation is presented.").

Indeed, even where the parties are *in pari delicto*, the courts will grant plaintiff relief if public policy demands it. *See Floyd*, 426 B.R. at 642; *Milbank*, 413 B.R. at 537; *Hill*, 388 B.R. at 748; *Smith*, 2007 Bankr. LEXIS 4708, at *13. Idaho, Delaware and Virginia law provide that under appropriate circumstances public policy trumps an *in pari delicto* defense. *Am. Int'l Group, Inc. v. Smith*, 976 A.2d 872, 883 (Del. Ch. 2009) (recognizing that "even if the parties do bear equal fault, *in pari delicto* will not bar an action where the suit involves sufficiently important countervailing interests of public policy")[12]; *Barry v. Pac. W. Constr., Inc.*, 103 P.3d 440, 446 (Idaho 2004) (noting that "even between parties *in pari delicto*, relief will sometimes be granted if public policy demands it") (internal quotations and citation omitted); *Tate v. Commercial Bldg. Assoc.*, 97 Va. 74 (Va. 1899). Here, public policy weighs decisively against the application of *in pari delicto*: the Trustee is not a wrongdoer and he is not representing the estate of wrongdoers -- he is pressing claims that once belonged to the corporate entities' estates for the sole benefit of innocent victims of wrongdoing perpetrated in the entities' name. *Accord Hill*, 388 B.R. at 749 ("The need to consider the 'peculiar facts and equities' is particularly acute when a defendant is asserting the defense against a Trustee who seeks recovery for the benefit of creditors of a wrongdoer rather than the wrongdoer himself."). Of course, weighing public policy is yet another inherently fact-intensive task.

To deny relief would be to thwart the very purpose of the Bankruptcy Code and the Plan without any corresponding benefit received in exchange for that loss. Numerous judges have noted

---

[12] The *AIG* court went on to reject the application of the adverse interest exception, and the innocent decisionmaker exception but that case dealt with shareholder derivative claims, a context far removed from this case or the situation in *Lafferty*.

the perverse and glaringly unfair result where *in pari delicto* is applied against an innocent claimant

seeking to vindicate the rights of third parties. *See, e.g.*, *Lafferty*, 267 F.3d at 362-63 (Cowen, J.,

dissenting) (explaining that "majority injects a pointless technicality into an equitable doctrine");

*Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.)*, 84 F.3d 1281, 1285 (10th Cir. 1996)

(conceding that bankruptcy trustee "articulates sound reasons why it might be wise to allow an

exception . . . in cases, such as this one, where the trustee's efforts stand to benefit hundreds of

innocent investors"). *In pari delcito* is an equitable doctrine and should be applied as such.

**C.    The Securities Fraud Exception Does Not Bar the RICO Claims**

Hirschler's position on the securities fraud exception to the RICO statute is not well taken

and clearly premature on this motion. It has not been established as a matter of law that the DBSI

TIC interests are securities. The scope of the DBSI fraud was far broader than just the sale of the

TIC interests and Hirschler was involved with many aspects of this fraudulent activity. It is,

moreover, remarkable that Hirschler would even raise this claim. Hirschler provided a formal

opinion of counsel that the TIC interests were *not* securities under *S.E.C. v. Howey*, 328 U.S. 293

(1946). This opinion provided the underpinning of the DBSI fraud for many years. Hirschler Op.

Letter at 16, Clifford Decl., Ex. B. The Trustee takes no position at this time whether Hirschler was

correct or whether the TIC interests were securities for the purpose of this action.[13] There is no

appellate or other authority binding on this Court one way or the other. But Hirschler cannot be

heard to deny now that there are factors that point toward a finding that the TIC interests are not

securities. Whether that exception would act as a bar to the Trustee's RICO claims must, in any

event, await discovery and a ruling from the Court as to each of the many aspects of Hirschler's

conduct that has been pled in the Complaint and that will come to light in discovery.

---

[13] The Trustee has alleged elsewhere that the TIC interests are in fact securities. The Federal Rules permit pleading in the alternative for such fact sensitive issues particularly where no court has ruled.

In any event, the Trustee's Complaint against Hirschler involves far more than just the TIC interests. No-one, for example, could claim that the Accountable Reserves were securities. Money paid for the Accountable Reserves was expressly not part of the like-kind exchange that qualified the transaction under I.R.C. § 1031. No income was to be generated by the Accountable Reserves payments. Under neither *Howey* nor any other test can the Accountable Reserves be considered a security. 328 U.S. at 298-99; *see also S.E.C. v. Edwards*, 540 U.S. 389, 394 (2004) (discussing expectation of profit in securities). It makes no difference that TIC Investors may have expected to gain from the TIC investment -- there was no expectation of profit associated with the Accountable Reserve payments. *Edwards,* 540 U.S. at 394 (discussing *Howey,* "we were speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest").

The DBSI fraud also diverges from simple securities fraud in the fact that the Insiders were looting the entities themselves. Securities fraud is committed when a person makes a misrepresentation in connection with the sale of securities. *See Collins & Aikman Corp. v. Stockman*, 2009 U.S. Dist. LEXIS 43472, at *28 (D. Del. May 20, 2009). Here, the DBSI Insiders (with the assistance of Hirschler) were simply misappropriating funds belonging to the company. This harmed existing Investors, it harmed the companies themselves, and it constituted a breach of trust. It amounted to a fraud on everyone that had an interest in DBSI. It did not involve a fraudulent misstatement in the sale of securities -- the harm would have been the same if the securities were exactly as described. In sum, the Insiders' acts of misappropriation of corporate funds and tax advantages, while fraudulent, were not securities fraud.

Lastly, as with many of its other points, if Hirschler is to escape liability for its involvement with DBSI it will have to do so at another stage of this litigation. Whether a particular interest is a security is a mixed question of fact and law. *United States v. Carman*, 577 F.2d 556, 562 (9th Cir. 1978); *see also S.F. Residence Club, Inc. v. Amado*, 2011 U.S. Dist. LEXIS 19230, at *15 (N.D. Cal.

Feb. 25, 2011) ("whether a TIC interest is an 'investment contract' requires a fact-based inquiry").

    **D.**    <u>**Breach of Fiduciary Duty/Breach of Trust**</u>

Hirschler's arguments on several of the breach of fiduciary duty counts depend on recharacterizing the victims contrary to the allegations of the Complaint.  It does not aid Hirschler to argue that the Insiders owed no duty to the Investors prior to their investing.  The Complaint alleges that, *after* Investors' funds were paid in, a constructive trust arose and fiduciary duties matured. The Accountable Reserves were paid pursuant to language (drafted by Hirschler) that created the expectation that those funds would be held separate and for a specified purpose--clearly creating either an express or constructive trust.

Where one "obtain[s] the legal title to . . . property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner," a constructive trust arises.[14] *Davenport v. Burke*, 167 P. 481, 484 (Idaho 1917); *see also Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) ("When one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty, a constructive trust will be imposed.").  "Delaware law defines a 'fiduciary relationship . . . [as] a situation where one person reposes *special trust* in another or where a special duty exists on the part of one person to protect the interests of another.'"  *Thomas v. Bd. of Educ.*, 759 F. Supp. 2d 477, 504 (D. Del. 2010) (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006)).  More specifically, "the finding of a fiduciary relationship is a factual inquiry that requires an examination into whether the relationship is of such a confidential or *dependent nature* as to rise to fiduciary status."  *Coleman v. Newborn*, 948 A.2d 422, 429 (Del. Ch. 2007) (emphasis added) (internal quotation omitted).

---

[14]  "A constructive trust arises where legal title to property has been obtained through actual fraud, misrepresentations, concealments, taking advantage of one's necessities, or under circumstances otherwise rendering it unconscionable for the holder of legal title to retain beneficial interest in the property."  *Witt v. Jones*, 722 P.2d 474, 477 (Idaho 1986).

Hirschler cites Delaware case law to argue that it cannot be liable for aiding and abetting a breach of fiduciary duty by the Insiders because creditors such as the Private Actions Trust assignees may not bring fiduciary duty claims against directors and officers based upon their management of the debtor company. First, as explained immediately *supra,* the fiduciary duty claims are not by any means solely based on mismanagement of corporate affairs. Second, Hirschler's statement of Delaware law is only party right. The very case they cite holds that the creditors may nonetheless bring a derivative action against insiders. Third, other jurisdictions, including Idaho, recognize direct fiduciary duty claims (or, alternatively, under the Trust Fund Doctrine) by creditors against insiders. *In re Murrell,* 2004 Bankr. LEXIS 1276 (Bankr. D. Idaho Aug. 12, 2004) (citing *La Voy Supply Co. v. Young,* 369 P.2d 45, 50 (Idaho 1962)); *Bank of Am. v. Musselman,* 222 F. Supp. 2d 792, 798 (E.D. Va. 2002); *Marshall v. Fredericksburg Lumber Co.,* 162 Va. 136, 173 S.E. 553 (1934)); *see also Luria v. Board of Dirs.,* 672 S.E.2d 837, 841 (Va. 2009) (assuming without deciding that fiduciary duty runs from managing member of insolvent L.L.C. to creditor).

### III.   The Fraudulent Transfer Counts are Well-Pled

Regarding the fraudulent transfer counts, Hirschler repeats its argument wholesale that insufficient facts are pled. Although the circumstances constituting fraud must be stated "with particularity" under Rule 9(b), a plaintiff may generally allege malice, intent, knowledge, and other conditions of mind. *Id.*; *see also Zazzali v. Mott (In re DBSI Inc.)*, 445 B.R. 344, 347 (Bankr. D. Del. 2011). "[C]ourts take a more liberal view when examining allegations of actual fraud . . . in the context of a fraudulent conveyance, since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (internal quotation marks omitted) (quoting *Picard v. Taylor (In re Park S. Sec., LLC)*, 326 B.R. 505, 517-18 (S.D.N.Y. 2005)). "[A]llegations of circumstantial evidence are sufficient," *Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*, 421

B.R. 626, 643 (Bankr. S.D.N.Y. 2009), because "the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time." *Stratton Oakmont*, 234 B.R. at 310 (citation omitted).  "A plaintiff need not set out in detail the facts upon which he bases his claim, so long as he gives the defendant(s) fair notice of the claim" and the reasons giving rise to the claim to permit a defendant to answer and to prepare for trial.  *Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.)*, 352 B.R. 36, 42 (Bankr. D. Del. 2006).

In *Springel v. Hotel Plaza Athenee (In re Innovative Commun. Corp.)*, Plaintiff satisfied the burden of pleading with particularity when, as the Trustee did here, each transfer was identified in a separate exhibit that provided the check number, check date, vendor name, check amount and the bank account information.  2010 Bankr. LEXIS 2297, *5 (Bankr. D.V.I. June 18, 2010).  The Trustee has pleaded several "badges of fraud" that evidence the Transferors' intent to defraud creditors.  *See Seville*, 742 F.2d at 791; *Char*ys, 2010 Bankr. LEXIS 2073, at *14.  Because the Trustee has alleged that the DBSI enterprise operated as a Ponzi scheme, the Transferors' "actual intent to hinder, delay or defraud" creditors is presumed as a matter of law.  *Id.*; *see also Quilling v. Stark*, 2006 WL 1683442, at *6 (N.D. Tex. June 19, 2006) ("The existence of a Ponzi scheme as alleged in the complaint makes the transfer of investor funds fraudulent as a matter of law.") .

With respect to constructive fraudulent conveyance, the Trustee has clearly alleged the transferor's insolvency.  Comp. ¶¶ 74-89.  Whether the payments were made in exchange for legal work of "'reasonably equivalent value' is necessarily a factual issue."  *Alexander v. DeLong, Caldwell, Novotny, & Bridgers, LLC (In re Terry Mfg. Co.)*, 358 B.R. 429, 434 (Bankr. M.D. Ala. 2006).  The Trustee has alleged that Hirschler's 'services' merely preserved the entities so that the Insiders could loot them.  These activities self-evidently did not preserve the transferors' net worth.

30

Dated: December 23, 2011
      Wilmington, Delaware

**GIBBONS P.C.**

By: /s/ Natasha M. Songonuga
Natasha M. Songonuga, Esq. (Bar No. 5391)
1000 N. West Street, Suite 1200
Wilmington, DE 19801-1058
Telephone: (302) 295-4875
E-mail: nsongonuga@gibbonslaw.com

Of Counsel:

Brian J. McMahon, Esq.
E. Evans Wohlforth, Jr., Esq.
Debra A. Clifford, Esq.

*Counsel to James R. Zazzali, Trustee for the
DBSI Estate Litigation Trust and Private
Actions Trust*