## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JAMES R. ZAZZALI, as Trustee for the DBSI
Private Actions Trust, and as Trustee for the
DBSI Estate Litigation Trust,

       Plaintiff,

   v.

HIRSCHLER FLEISCHER, P.C.,

       Defendants.

Civil Action No. 11-cv-0614-LPS

---

## DECLARATION OF DEBRA A. CLIFFORD

Debra A. Clifford, Esq. declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.     I am an attorney duly admitted to practice law in the courts of the States of New Jersey and New York. I am a Director in the firm of Gibbons P.C., attorneys for James R. Zazzali, Trustee for the DBSI Estate Litigation Trust and DBSI Private Actions Trust. I am admitted *pro hac vice* in this Court for the above-captioned matter.

2.     This Declaration is submitted in support of the Trustee's Memorandum of Law in Opposition to Hirschler Fleischer, P.C.'s Motion to Dismiss the Complaint for Failure to State a Claim.

3.     Attached hereto as <u>Exhibit A</u> are relevant pages from a private placement memorandum ("<u>PPM</u>") drafted and/or reviewed by Hirschler Fleischer, P.C.

4.     Attached hereto as <u>Exhibit B</u> is a true and correct copy of the letter opinion drafted by Hirschler Fleischer, P.C. regarding whether a tenant in common ("TIC") interest constitutes a security.

I declare under penalty of perjury that the foregoing statements made by me are true and correct.


Dated: December 20, 2011                    Debra A. Clifford
       Newark, New Jersey                   _____
                                            Debra A. Clifford

EXHIBIT A

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
## Dated October 20, 2006

### TENANT IN COMMON INTERESTS
### IN
### ROYAL MONTREAL PLAZA

*1% Interest:  $46,360 of equity, $50,000 of estimated debt*
*Minimum Purchase: 3.57% Interest*
*($165,571 of equity, $178,571 of estimated debt)*
*Maximum Offering Amount: $4,636,000*
*($4,636,000 of equity, $5,000,000 of estimated debt)*

———————————

DBSI Royal Montreal LLC, a Delaware limited liability company, which is wholly-owned and managed by DBSI Housing Inc., an Idaho corporation, has been formed to acquire and sell undivided tenant in common interests in Royal Montreal Plaza, a Class "B" retail plaza located at 2004 S. Mason Road, Katy, Harris County, Texas 77450 (the "Property").  The Property is situated on approximately 5.59 acres and consists of two single-story buildings containing approximately 40,300 net rentable square feet in the aggregate.  According to information provided by the seller of the Property, the Property is currently 90.0% leased to ten tenants. Capitalized terms used herein have the meanings set forth in the "Glossary."

The Company intends to acquire the Property from an unrelated third-party seller in the fourth quarter of 2006 for total consideration of $8,030,000 and will convey it to the Purchasers for $9,636,000.  The Purchasers, jointly and severally, will enter into the Loan with the Lender in an original principal amount estimated to be $5,000,000 (51.9% of the Purchase Price and 62.3% of the price paid to the seller).

The Company is offering up to 100% of the Interests to prospective Purchasers pursuant to this Memorandum.  The Purchasers will pay $46,360 for each 1% Interest, and will enter into their pro rata share of the Loan (estimated to be $50,000 for each 1% Interest).  The minimum purchase is a 3.57% Interest ($165,571 of equity and $178,571 of debt) unless the Company, in its sole discretion, allows a smaller investment.  The Company will retain any Interests not acquired by the Purchasers.  The holding period for the Property is anticipated to be five to ten years.

DBSI Master Leaseco, Inc., an Idaho corporation ("DBSI Leaseco"), which is wholly-owned by DBSI Housing Inc., will master lease the entire Property from the Tenants in Common on a triple-net basis for a term of 20 years.  Base Rent will be $301,340 for the first year, and will increase annually by 1% of the prior year's amount, to a maximum of $364,052 in year 20.  As master lessee, DBSI Leaseco will be responsible for all costs of operating, managing, leasing and maintaining the Property during the term of the Master Lease, excluding Capital Expenses.

The Interests have not been registered under the Securities Act, or the securities laws of any state, and are being offered and sold in reliance on exemptions from the registration requirements of the Securities Act and such state laws.  The Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and such state laws pursuant to registration or exemption therefrom.

**The Interests have not been approved or disapproved by the Securities and Exchange Commission, any state securities commission or other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of this Offering or the accuracy or adequacy of this Memorandum.  Any representation to the contrary is unlawful.**

**An investment in Interests is highly speculative and involves substantial investment and tax risks.  See "Risk Factors" beginning on page 16 for a complete discussion of the risks, including, but not limited to, the following:**

- Texas currently imposes a franchise tax on limited liability companies doing business in Texas and will impose a margin tax on such entities beginning January 2007;
- leases representing 23.8% of the net rentable area of the Property terminate within the next five years of its term;
- the Loan will have a term of ten years, and will require monthly payments of interest only for the first five years;
- there are significant tax risks for Purchasers acquiring Interests as replacement property in a Section 1031 tax-deferred exchange, including risks relating to the identification of the Property pursuant to Section 1031;
- this is a "best efforts" offering with no minimum or escrow requirements;
- the Purchasers will rely totally on DBSI Leaseco to manage and operate the Property and pay the Rent during the Term of the Master Lease;

- the Property is not a diversified investment;
- there are various conflicts of interest among the Company, DBSI Leaseco, DBSI Housing Inc., DBSI Securities Corporation and their Affiliates; and
- based upon the Purchase Price, the Property will be 51.9% leveraged.

| | Price to Purchasers | Selling Commissions and Expenses [1] | Proceeds to the Company [2] |
|---|---|---|---|
| Per 1% Interest in the Property[3] | $46,360 | $4,636 | $41,724 |
| Maximum Amount[4] | $4,636,000 | $463,600 | $4,172,400 |

[1] DBSI Securities Corporation (a member of the NASD and an Affiliate of the Company, DBSI Leaseco, DBSI Housing Inc. and their Affiliates) will act as Managing Broker-Dealer. Offers and sales of Interests will be made on a "best efforts" basis by Selling Group Members. The Company will pay the Managing Broker-Dealer Selling Commissions and Expense Reimbursements that will be re-allowed to the Selling Group Members. The total amount of the Selling Commissions and Expense Reimbursements is equal to 8.0% of the Gross Proceeds of this Offering (7.0% for commissions, 0.5% for selling expense reimbursements, and 0.5% for due diligence expense reimbursements). The Selling Group Member's selling and due diligence expense reimbursements are non-accountable. The Managing Broker-Dealer will also receive a non-accountable marketing allowance of 2.0% of the gross proceeds of the Offering for costs associated with wholesaling, marketing and related costs, up to 100 basis points of which may be re-allowed to Selling Group Members. In addition, certain Purchasers, including, but not limited to Affiliates, may purchase Interests net of Selling Commissions and Expense Reimbursements.

[2] Amounts shown are proceeds after deducting Selling Commissions and Expense Reimbursements, but before deducting organization and marketing expenses and other expenses incurred in connection with the acquisition of the Property.

[3] The minimum purchase is a 3.57% Interest (approximately $344,142, which equals $165,571 of equity and $178,571 of estimated debt). The Company reserves the right, in its sole discretion, to waive the minimum purchase requirement.

[4] This is a "best efforts" offering with no minimum or escrow requirements; therefore, all payments for Interests received from Purchasers or released by the Purchasers' qualified intermediaries will be deposited in escrow established by the Escrow Agent. At closing, the funds will be distributed to the seller of the Property and as otherwise described in this Memorandum. See "Estimated Use of Proceeds."

An investment in Interests is suitable only for persons of substantial means who satisfy certain suitability requirements and have no need for liquidity in their investment. See "Who May Invest." In making an investment decision, prospective Purchasers must rely on their own examination of the Property, the Company, DBSI Leaseco, DBSI Housing Inc. and the terms of the Offering, including the merits and risks involved.

The Securities Act and the securities laws of certain jurisdictions grant purchasers of securities sold in violation of the registration or qualification provisions of such laws the right to rescind their purchase of such securities and to receive back the consideration paid. The Company believes that this Offering is not required to be registered or qualified. Many of these laws granting the right of rescission also provide that suits for such violations must be brought within a specified time, usually three years from discovery of facts constituting such violation. Should any Purchaser institute such an action on the theory that this Offering was required to be registered or qualified, the Company contends that the contents of this Memorandum constituted notice of the facts constituting such violation.

---

**No person has been authorized to give any information or make any representations other than those contained in this Memorandum and, if given or made, such information or representations must not be relied upon.**

---

**This Memorandum does not constitute an offer or solicitation by anyone in any jurisdiction in which such an offer or solicitation is not authorized, or in which the person making such an offer is not qualified to do so, or to any person to whom it is unlawful to make an offer or solicitation.**

---

Neither the information contained herein, nor any prior, contemporaneous or subsequent communication should be construed by the prospective investor as legal or tax advice. Each prospective Purchaser should consult his own legal, tax and financial advisors to ascertain the merits and risks of the transactions described herein prior to subscribing for the Interests.

capital contribution to DBSI Master Leaseco, Inc. in an amount equal to the outstanding principal balance of such unpaid loan. As of October 9, 2006, the aggregate outstanding principal balance of all such loans was approximately $14,250,000. The financial statements of DBSI Master Leaseco, Inc. are audited on an annual basis and made available to Investors upon request. See "The Company, DBSI Leaseco, DBSI Housing Inc. and DBSI Securities Corporation" and the Master Lease attached hereto as Exhibit D.

**DBSI Housing Inc.:** DBSI Housing Inc., the sole member and manager of the Company is a member of the DBSI Group of Companies (DBSI). In 27 years, DBSI and its Affiliates have grown to more than 600 employees and have raised more than $700 million in capital. DBSI currently manages assets valued at over $1.6 billion. DBSI Housing Inc. has a net worth of more than $89 million, and its offerings have included more than 60 traditional real estate offerings, 13 debt offerings, and numerous commercial real estate projects. This includes more than 46 tenant in common offerings in 26 states. The shareholders of DBSI Housing Inc. are Douglas L. Swenson, Charles E. Hassard, and John Mayeron. See Exhibit E, "Financial Statement of DBSI Housing Inc.; Prior Performance Schedule." DBSI Housing Inc. will be the guarantor under the Master Lease Guaranty.

**Compensation to the Company, DBSI Leaseco, DBSI Housing Inc., DBSI Securities Corporation and their Affiliates:** The Company, DBSI Leaseco, DBSI Housing Inc., DBSI Securities Corporation and their Affiliates will receive substantial fees and compensation from the Offering and sale of Interests, pursuant to this Memorandum, and from the management, operation and leasing of the Property, as described elsewhere herein. See "Compensation to the Company, DBSI Leaseco, DBSI Housing Inc., DBSI Securities Corporation and their Affiliates."

## The Property

**Description:** The Property is a Class "B" retail plaza located at 2004 S. Mason Road, Katy, Harris County, Texas 77450. The Property is situated on approximately 5.59 acres and consists of two single-story buildings containing approximately 40,300 net rentable square feet in the aggregate. See "Description of the Property."

**Tenancy:** The Property will be master leased to DBSI Leaseco on a triple-net basis in accordance with the Master Lease. DBSI Leaseco, in turn, will sublease the Property to one or more tenants. According to information provided by the seller of the Property, the Property is leased to ten tenants and has a combined occupancy of approximately 90.00%. See "Description of the Property."

**Acquisition:** The Company intends to acquire the Property from an unrelated third party in the fourth quarter of 2006 for total consideration of $8,030,000. At closing, the Purchasers will enter into or assume their pro rata shares of the Loan made by the Lender in the original principal amount estimated to be $5,000,000. At settlement, each Purchaser will pay his pro rata share of the Purchase Price and will assume the obligation to return any tenant security deposits. See "Estimated Use of Proceeds" and "Acquisition Terms and Financing."

**Financing:** The Property will be financed with the Loan to be made by the Lender in the original principal amount estimated to be $5,000,000 (51.9% of the Purchase Price and 62.3% of the price paid to the seller). The Loan will be made to the Purchasers on a joint and several basis, and will be secured by the Property. The Company anticipates that the Loan will bear annual interest at a fixed rate of 5.736%, which is locked until January 1, 2007. After that time, the Loan will bear annual interest at a fixed rate equal to a Loan Spread of 1.15% (115 basis points) plus the Index. The Company expects the Loan to have a term of 10 years and that it will be amortized over 30 years after the initial five year interest only period. The Company expects that the Loan will require payments of interest only during the first five years of its term and level payments of principal and interest thereafter until maturity, at which time the remaining principal balance and any accrued but unpaid

interest will be due. The Loan documents will likely provide that, under certain circumstances, the termination of the Master Lease or a transfer of Interests without the Lender's prior written consent will constitute an event of default under the Loan. See "Acquisition Terms and Financing." The Company anticipates that the Loan will be non-recourse to the Purchasers, except with respect to losses and damages incurred by the Lender as a result of (a) fraud or misrepresentation, (b) waste, (c) failure to pay taxes, assessments or insurance premiums, (d) misapplication of insurance or condemnation proceeds or security deposits, (e) misapplication of rents, (f) gross negligence, willful misconduct or criminal acts and (g) to permit Lender to recover under the Environmental Indemnity Agreement into which each Purchaser must enter. This means that, generally, the Lender will have full recourse against the Property (i.e., Lender may foreclose on the Property), but may not proceed against the Purchasers personally for any deficiency that may occur. DBSI Housing Inc. and Douglas L. Swenson will provide their guaranty of recourse obligations under the Loan. See "Acquisition Terms and Financing." However, if the Lender were to foreclose on the Property following an uncured event of default on the Loan, the Purchasers would be likely to lose their entire investment in the Property and suffer adverse tax consequences. See "Risk Factors — Additional Risks Relating to the Loan and Other Financing" and "Federal Income Tax Consequences — Foreclosure."

**Sale and Refinancing:**

The Company anticipates that the Purchasers will own their Interests for approximately five to ten years. The approval of all Tenants in Common is required to sell all or any portion of the Property and to refinance the Loan. See "Summary of the Tenants in Common Agreement — Voting."

**Tenants in Common:**

The Purchasers (and the Company if less than 100% of the Interests are sold) will own Interests in the Property and are referred to herein collectively as the "Tenants in Common."

**Tenants in Common Agreement:**

Each Purchaser will enter into the Tenants in Common Agreement. See "Summary of the Tenants in Common Agreement" and the form of the Tenants in Common Agreement attached hereto as Exhibit C. The Tenants in Common, as lessor, will enter into or assume the Master Lease pursuant to which the entire Property is leased to DBSI Leaseco, as Master Lessee, on a triple-net basis. The Tenants in Common must <u>unanimously</u> approve the following:

- the Master Lease (deemed approved by subscribing for Interests) and any amendments or renewals of the Master Lease during its Term;
- all leases, lease amendments and renewals after the expiration or termination of the Master Lease;
- all management and brokerage agreements after the expiration or termination of the Master Lease;
- any financing or refinancing of the Property, including refinancing the Loan; and
- sale of the Property.

All other actions or decisions of the Tenants in Common will require the vote of the Tenants in Common who together own more than 50% of the Interests. See "Summary of the Tenants in Common Agreement — Voting." The Tenants in Common Agreement will terminate no later than December 31, 2036.

**Tax Opinion:**

The Company has obtained from its Counsel, Hirschler Fleischer, the Tax Opinion, attached hereto as Exhibit G, which states that Interests should be treated as undivided interests in real estate and not as partnership interests. The Company has structured the Tenants in Common Agreement and the Master Lease in an effort to comply in material respects with the conditions set forth in Revenue Procedure 2002-22, 2002-1 C. B. 733 so that a Purchaser should be treated as acquiring an interest in real estate rather than a partnership interest for federal income tax purposes. See the Tax Opinion attached hereto as Exhibit G and "Federal Income Tax Consequences — Status as Tenants in Common."

## ESTIMATED USE OF PROCEEDS

The following table sets forth certain information concerning the estimated use of proceeds of the Offering:

| Estimated Sources of Capital | Total | % of Total Capitalization | % of Equity |
|---|---|---|---|
| Equity | $4,636,000 | 48.1% | 100.00% |
| Debt | 5,000,000 | 51.9% | 0.00% |
| Total Capital | $9,636,000 | 100.00% | 100.00% |

| Estimated Sources of Capital | Total | % of Total Capitalization | % of Equity |
|---|---|---|---|
| Total Capital[(1)] | $9,636,000 | 100.00% | 100.00% |
| Selling Commissions and Expense Reimbursements[(2)] | (370,880) | 3.85% | 8.00% |
| Non-Accountable Marketing Allowance[(3)] | (92,720) | 0.96% | 2.00% |
| Non-Accountable Offering and Closing Costs[(4)] | (202,760) | 2.10% | 4.37% |
| Available for Investment | $8,969,640 | 93.08% | 85.63% |
| Property Cost and Fees[(5)] | (8,598,440) | 89.23% | 77.62% |
| Accountable Reserves[(6)] | (321,200) | 3.33% | 6.93% |
| Non-Accountable Acquisition Related Expenses | (50,000) | 0.52% | 1.08% |
| Proceeds Utilized | 8,969,640 | 93.08% | 85.63% |
| Offering and Closing Expenses and Fees | 666,360 | 6.92% | 14.37% |
| Total Application of Capitol | $9,636,000 | 100.00% | 100.00% |

---

[(1)] For maximum sale of 100% of the Interests.

[(2)] DBSI Securities Corporation (a member of the NASD and an Affiliate of the Company, DBSI Leaseco, DBSI Housing Inc. and their Affiliates) will act as Managing Broker-Dealer. Offers and sales of Interests will be made on a "best efforts" basis by Selling Group Members. The Company will pay the Managing Broker-Dealer Selling Commissions and Expense Reimbursements of (a) up to 7% of the Gross Proceeds for Commissions, (b) up to 0.5% of the Gross Proceeds as a non-accountable marketing expense allowance and (c) up to 0.5% of the Gross Proceeds as non-accountable reimbursements for due diligence expenses, all of which may be re-allowed to the Selling Group Members. In addition, certain purchasers of Interests, including, but not limited to, Affiliates of the Company, may purchase their Interests net of Selling Commissions and Expense Reimbursements. Any Interests purchased by Affiliates will be for investment purposes only and not with a view toward resale.

[(3)] The Managing Broker-Dealer will receive a non-accountable marketing and due diligence allowance of 2.0% of the Gross Proceeds for wholesaling and marketing costs, a portion of which may be re-allowed to Selling Group Members.

[(4)] Affiliates of the Company will receive non-accountable fees in connection with the preparation of this Offering and closing the acquisition of the Property from the seller.

[(5)] Includes acquisition and closing fees payable to Affiliates of the Company of $364,960 due diligence and investment analysis costs and fees payable to Affiliates of the Company of $132,480 and estimated loan fees of $71,000. See "Acquisition Terms and Financing" and "Compensation to the Company, DBSI Leaseco, DBSI Housing Inc., DBSI Securities Corporation and their Affiliates."

[(6)] Accountable reserves for tenant improvements and leasing commissions will be repaid to the Purchasers to the extent not used in the operation of the Property. A portion of the Reserves may be allocated to the Lender to cover reserves required by the Lender.

never had any lender foreclose on a property securing a loan nor has DBSI Housing Inc. or any of its Affiliates filed for bankruptcy.

## PRIOR PERFORMANCE

See Exhibit E, "Financial Statement of DBSI Housing Inc.; Prior Performance Schedule," for a description of the financial condition, current assets and liabilities, balance sheet and prior performance of DBSI Housing Inc.

## FIDUCIARY DUTIES OF THE COMPANY AND DBSI HOUSING INC.

None of the Company, DBSI Housing Inc. nor any Tenant in Common will have a fiduciary duty to the other Tenants in Common, as would be applicable to an investment in a corporation, limited liability company or partnership. Similarly, DBSI Housing Inc. will not have a fiduciary duty to the Purchasers under the Master Lease.

The funds of the Company will not be commingled with the funds of any other person or entity except for operating revenues from the Property.

[Remainder of This Page Intentionally Left Blank]

# FEDERAL INCOME TAX CONSEQUENCES

Prospective Purchasers should not view the following federal income tax consequences as a substitute for careful tax planning, particularly since the income tax consequences of an investment in Interests are complex and vary for each Purchaser due to the factual nature of many tax issues. Prospective Purchasers should be aware that the following discussion necessarily condenses or eliminates many details that might materially and adversely affect some Purchasers and, except where noted, it does not address state, local or foreign tax laws. The discussion of the tax aspects contained herein is based on the law presently in effect. Prospective Purchasers should be aware that new legislative, administrative or judicial action could significantly change the tax treatment of the Interests. Finally, prospective Purchasers might be faced with substantial legal and accounting costs in resisting a challenge by the IRS to the tax treatment of an investment in Interests, even if the IRS's challenge proves unsuccessful.

There is uncertainty concerning a number of the tax issues discussed herein and there can be no assurance that some of the deductions claimed or positions taken by a Purchaser will not be challenged by the IRS. Prospective Purchasers should not purchase Interests for the purpose of obtaining tax shelter for income from active sources because the Interests should not provide any such tax shelter.

No ruling from the IRS has been obtained with respect to any of the tax aspects of an investment in the Interests or the qualification of the Interests for nonrecognition under Section 1031 of the Code. Accordingly, prospective Purchasers must consult their own tax advisors as to the tax consequences of purchasing and owning the Interests and the qualification for nonrecognition under Section 1031 of the Code.

**Prior to the purchase of an Interest, each prospective Purchaser is required to represent that (1) he has consulted his own tax advisor regarding an investment in an Interest and, if applicable, the qualification of the Interest under Section 1031 of the Code and applicable state tax laws, and (2) except for the Tax Opinion, he is not relying on the Company, DBSI Leaseco, DBSI Housing Inc., any of their Affiliates, or their agents, including their attorneys and accountants, or any member of the Selling Group for tax advice regarding qualification under Section 1031 of the Code and he is not relying on any statements made in this Memorandum regarding qualification of the Interest under Section 1031 of the Code.**

**Treasury Department Circular 230 ("Circular 230") Notice: To ensure compliance with Circular 230, prospective Purchasers are hereby notified that: (1) any discussion of federal tax issues contained or referenced in this Memorandum is written in connection with the promotion or marketing by the Company of the transactions or matters addressed in this Memorandum; and (2) prospective Purchasers should seek advice based on their particular circumstances from an independent tax advisor.**

## Status as Tenants in Common

1.    Introduction.  This subsection addresses whether Interests will qualify as interests in real property for purposes of the like-kind exchange rules of Section 1031 of the Code. The Company believes that, if challenged and litigated, Interests should be considered interests in real property rather than partnership interests or securities for purposes of Section 1031 of the Code. Hirschler Fleischer, Counsel, will render the Tax Opinion that sets forth this conclusion. See Exhibit G for a copy of the Tax Opinion and the Officer's Certificate as to certain representations and factual matters. However, the Tax Opinion is not binding on the IRS and is subject to material assumptions and factual representations made by the Company in the Affidavit attached thereto, which may not be accurate. In addition, a ruling will not be obtained from the IRS.

The Tax Opinion is based on Counsel's review of:

(1)    this Memorandum,
(2)    the Tenants in Common Agreement,
(3)    the Master Lease,
(4)    the leases with the tenants, and
(5)    an Officer's Certificate from the Company attached to the Tax Opinion, and, in particular, on the matters described below.

# REPORTS

As long as the Master Lease is in effect, DBSI Leaseco will keep proper and complete records and books of account of the Property for the Purchasers, which will not be audited. These books and records will be kept at DBSI Leaseco's principal place of business and each Purchaser will at all times, during reasonable business hours, have the right to inspect, examine and copy such books and records.

Further, at least as frequently as the end of each calendar quarter, during the Term of the Master Lease, DBSI Leaseco will provide

(1)     an operating statement as to the Property for such quarter;
(2)     a rent roll as to the Property as of the last day of the quarter;
(3)     a report reflecting any structural alterations made to the Property during such quarter; and
(4)     a list, to the best of DBSI Leaseco's knowledge, of all current persons or parties constituting the landlord under the Master Lease.

# LITIGATION

There are no material legal actions pending against DBSI Leaseco, DBSI Housing Inc. or the Company.

# ACCOUNTING MATTERS

**Financial Statements**

The attached unaudited estimated current value financial statements of value available to support obligations of DBSI Housing Inc. are provided to prospective Purchasers of Interests in connection with the Memorandum and should be read only in conjunction with the Memorandum.

# LEGAL OPINION

Hirschler Fleischer, A Professional Corporation, of Richmond, Virginia, has provided its Tax Opinion for certain tax issues set forth in this Memorandum. A copy of the Tax Opinion is attached hereto as Exhibit G.

Counsel represents the Company, DBSI Leaseco, DBSI Housing Inc. and DBSI Securities Corporation, as well as certain of their Affiliates. Counsel has rendered the Tax Opinion with respect to certain issues as set forth in this Memorandum. Except as to matters stated therein, which are based upon the law in effect as of the date of the opinion, the issuance of the Tax Opinion should not in any way be construed as implying that Counsel has approved or passed upon any other matter for the Company. Counsel does not represent any prospective Purchaser in connection with the Offering.

# ADDITIONAL INFORMATION

The Company will answer inquiries from prospective Purchasers concerning Interests and other matters relating to the offer and sale of Interests, and the Company will afford prospective Purchasers the opportunity to obtain any additional information to the extent the Company possesses such information or can acquire such information without unreasonable effort or expense that is necessary to verify the information in this Memorandum.

Prospective Purchasers are entitled to review copies of other material contracts relating to Interests described in this Memorandum.

# GLOSSARY

"Accredited Investor" has the meaning set forth in the section of this Memorandum entitled "Who May Invest."

"ADA" means the Americans with Disabilities Act of 1990, as amended.

"Additional Rent" means interest, principal and escrow payments for taxes and insurance on the Loan payable by DBSI Leaseco in accordance with the Master Lease.

"Advancing Party" means any Tenant(s) in Common or DBSI Leaseco who advance funds to another Tenant in Common.

"Affiliate" means (1) any person directly or indirectly controlling, controlled by or under common control with another person; (2) a person owning or controlling 10% or more of the outstanding voting securities of such other person; (3) any officer, director or partner of such other person; and (4) if such other person is an officer, director or partner, any company for which such person acts in any capacity. The term "person" shall include any natural person, corporation, partnership, trust, unincorporated association or other legal entity.

"Base Rent" means the amount of $301,340 for the first year, and will increase annually by 1% of the prior year's amount, to a maximum of $364,052 in year 20 payable by DBSI Leaseco to the Tenants in Common under the Master Lease, subject to reduction in the event that the Purchasers' Capital investment in the Property is reduced. See "Summary of Master Lease - Rent."

"Call Option" means the Call Option contained in the Tenants in Common Agreement.

"Capital Expenses" means expenses of the Property incurred with respect to the roof, exterior walls and foundation, and any expenditures for structural improvements and structural alterations to the Property.

"Closing" means the date on which the Property is transferred to the Tenants in Common.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means DBSI Royal Montreal LLC, a Delaware limited liability company.

"Consenting Tenants in Common" shall have the meaning set forth in the Tenants in Common Agreement.

"Counsel" means Hirschler Fleischer, A Professional Corporation, located in Richmond, Virginia.

"DBSI Leaseco" means DBSI Master Leaseco, Inc., an Idaho corporation, which is wholly-owned by DBSI Housing Inc.

"Dissenting Tenants in Common" shall have the meaning set forth in the Tenants in Common Agreement.

"ERISA" means the Employee Retirement and Income Security Act of 1974, as amended.

"Escrow" means an account that complies in all material respects with Rule 15c2-4 promulgated under the Exchange Act, as the same is interpreted by the NASD from time to time.

"Escrow Agent" means a bank or other financial institutions this satisfies the requirements of Rule 15c2-4 promulgated under the Exchange Act, as the same is interpreted by the NASD from time to time.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Gross Proceeds" means the sum of all money raised by the Company through the sale of Interests pursuant to this Memorandum.

EXHIBIT B



**HIRSCHLER FLEISCHER**

A PROFESSIONAL CORPORATION

A T T O R N E Y S   A T   L A W

Federal Reserve Bank Building
701 East Byrd Street
Richmond, VA 23219
Telephone: 804-771-9500
Facsimile: 804-644-0957

Mailing Address:
Post Office Box 500
Richmond, VA 23218-0500

Fredericksburg Office:
725 Jackson Street, Suite 200
Fredericksburg, VA 22401-5720
Phone: 540-372-3515
Fax: 540-372-3941
www.hf-law.com

August 14, 2004

FOR 1031 LLC
12462 West Explorer Drive
Boise, Idaho  83713

      RE:     Tenant in Common Interest in Developed Real Estate With Master Lease

Ladies and Gentlemen:

      You have requested our advice concerning whether an undivided fractional tenant in common interest in developed real estate subject to a master lease created pursuant to the standard documents and circumstances described below constitutes a "security" under federal securities law.

      The opinion set forth in this letter is based on relevant provisions of the Securities Act of 1933, as amended (the "1933 Act"), the Securities Exchange Act of 1934, as amended (the "1934 Act"), and on interpretations of the foregoing as expressed in published guidance of the Securities and Exchange Commission ("SEC") and court decisions as of the date hereof. These provisions and interpretations are subject to change and any such changes might result in a modification of our opinion. Our opinion is not binding on the SEC or courts of applicable jurisdiction. Also, if the facts and circumstances of an actual undivided fractional tenant in common interest in real estate differ from the facts and circumstances described in this letter, our advice could differ from the advice given in this letter.

      In connection with rendering our opinion, we examined the following documents: (i) the form of NNN Plus Lease attached as Exhibit A (the "Lease"), (ii) the form of Purchase Agreement and Escrow Instructions attached as Exhibit B, (iii) the form of Tenants in Common Agreement attached as Exhibit C (the "TIC Agreement"), (iv) the form of Loan Assumption Agreement attached as Exhibit D and (v) the form of Limited Power of Attorney attached as Exhibit E (the "Limited Power of Attorney"). We have relied on the representations made in the documents attached as Exhibits A through E (collectively, the "Transaction Documents") and in the Officers' Certificate dated of even date herewith (the "Officers' Certificate").

      Our opinion is based upon the following facts:

      From time to time, a limited liability company (a "Company") managed by FOR 1031 LLC will purchase improved real estate that is producing income from one or more tenants (the "Real Property"). Upon completing the acquisition of the Real Property, the Company will lease the Real Property to DBSI



HIRSCHLER FLEISCHER

Housing, Inc. (the "Master Lessee") pursuant to a Lease under which the Master Lessee will operate the Real Property for its own account and assume the landlord's obligations under the leases with existing and future tenants (which will become subtenants). The Company will then sell undivided fractional tenant in common interests in the Real Property (the "TIC Interests") to others. It is expected that all or most of the purchases will be made to complete like-kind exchanges of real property pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "Code") of 1986, as amended (the "Code").

In some cases, the Real Property will be encumbered by a deed of trust or mortgage and other loan documents in favor of a third-party lender. Each person who acquires a TIC Interest in the Real Property (each, a "Tenant in Common") also will assume, or take his TIC Interest subject to, his proportionate share of such loan obligations.

Each Lease will have a term of 20 years, be on a triple-net basis, and call for commercially reasonable fixed rent with graduated fixed increases over its term. The Lease may be terminated at any time, with or without cause, by majority approval of the Tenants in Common or upon the sale of the Real Property. The Lease requires the Master Lessee, as part of its rental payment, to make the payments on the mortgage debt secured by the Real Property. The Master Lessee will assume the landlord's obligations under any existing tenant leases, pay property taxes, insurance premiums, repair and maintenance expenses and provide subtenants with customary services, such as heat, air conditioning, trash removal, unattended parking, and maintenance of public areas. Each Tenant in Common will receive rent directly from the Master Lessee, and each separately will benefit from debt service payments made by the Master Lessee.

Prior to acquiring a TIC Interest in the Real Property, a prospective Tenant in Common will be furnished with information concerning the physical condition of the Real Property, the terms of the Lease, the status of the Master Lessee, and the operational performance of the Real Property. You have indicated that such information is the same as a typical prospective purchaser of a similar master-leased whole commercial property would reasonably expect to obtain. The Lease also requires the Master Lessee to periodically provide each Tenant in Common with information about the operation of the Real Property. The information to be provided, as well as the timing of delivery, will be at least commensurate with the information an experienced property manager would be expected to provide to the owner of similar commercial property. The information will be provided to the Tenants in Common through a secure website and will be updated at least quarterly. The website also will include a secure mechanism for the Tenants in Common to be able to communicate directly among themselves.

Even though the Real Property is subject to a Lease, the Tenants in Common retain ultimate control over the Real Property. For example, at any time, the Tenants in Common may terminate the Lease and may sell the Real Property. On an individual level, each Tenant in Common has the right to sell or encumber his TIC Interest, subject to the terms and conditions of any mortgage debt encumbering the Real Property. Also, each Tenant in Common has the right to cause a judicial partition or sale of the Real Property, although under the terms of the TIC Agreement, the other Tenants in Common would have the right to purchase the TIC Interest of such Tenant in Common at the then fair market value prior to any partition or sale being effected, as provided under Revenue Procedure 2002-22, 2002-1 C.B. 733 (March 19, 2002 )(the "Revenue Procedure").

Under the TIC Agreement, the Tenants in Common agree not to treat themselves as partners for any purpose, not to maintain any partnership books, not to file any partnership tax returns, and not to maintain any joint accounts. When a Tenant in Common purchases a TIC Interest, the Tenant in





# HIRSCHLER FLEISCHER

Common will execute a protective election set forth in the TIC Agreement that the Tenants in Common will be excluded from the provisions of Subchapter K (dealing with partnerships) of the Code. In addition to the fact that most Tenants in Common are expected to obtain their purchase funds directly from previously owned real estate, each Tenant in Common also must represent that he has substantial prior experience in owning and operating developed real estate and is aware of, is capable of exercising, and intends to exercise, his control rights under the Transaction Documents.

The Tenants in Common will execute the Limited Power of Attorney, which authorizes the Company to execute specific documents on behalf of the Tenants in Common. Each Tenant in Common will receive copies of any proposed document that relates to the Real Property to review and discuss as needed. The Tenants in Common must approve any document affecting the Real Property in accordance with the Revenue Procedure and the TIC Agreement prior to the Company executing such document pursuant to the Limited Power of Attorney. The Revenue Procedure states that a co-owner who has consented to an action may grant a power of attorney to execute specific documents with respect to that action, but the Revenue Procedure prohibits co-owners from granting general powers of attorney. Revenue Procedure at § 6.05. The Company's authority under the Limited Power of Attorney is not general, but is confined to the execution of documents specifically authorized by the Tenants in Common. Instead of acting as a general power of attorney, the Limited Power of Attorney is used as an administrative convenience, to allow for centralized execution and delivery of documents after such documents have been negotiated and approved by the Tenants in Common. Accordingly, the Limited Power of Attorney does not diminish the right or ability of the Tenants in Common to control the Real Property.

In the Revenue Procedure, the Internal Revenue Service issued prerequisites for obtaining an advance private letter ruling that an undivided tenant in common interest in real estate will be considered a direct interest in real property and not a partnership or other business entity for purposes of Section 1031 of the Code. You have represented that the ownership structure of the Real Property is intended to comply with the requirements for an advance ruling set forth in the Revenue Procedure.

The Revenue Procedure contains fifteen requirements for an advance ruling. One of the key requirements governs voting and provides as follows:

> The co-owners must retain the right to approve the hiring of any manager, the sale or other disposition of the Property, any leases of a portion or all of the Property, or the creation or modification of a blanket lien. Any sale, lease, or re-lease of a portion or all of the Property, any negotiation or re-negotiation of indebtedness secured by blanket lien, the hiring of any manager, or the negotiation of any management contract (or any extension or renewal of such contract) must be by unanimous approval of the co-owners. For all other actions on behalf of the co-ownership, the co-owners may agree to be bound by the vote of those holding more than fifty percent of the undivided interest in the Property. A co-owner who has consented to an action in conformance with this section 6.05 may provide the manager or other person a power of attorney to execute a specific document with respect to that action, but may not provide the manager or other person with a global power of attorney.

Revenue Procedure at § 6.05. Thus, the co-owners must remain in control of the property and may not delegate decision-making authority over these functions to a manager or other party.



## HIRSCHLER FLEISCHER

Management is another key requirement under the Revenue Procedure, which provides as follows:

> The co-owners may enter into management or brokerage agreements, which must be renewable no less frequently than annually, with an agent, who may be the sponsor or a co-owner (or any person related to the sponsor or a co-owner), but who may not be a lessee. The management agreement may authorize the manager to maintain a common bank account for the collection and deposit of rents and to offset expenses associated with the Property against any revenues before disbursing each co-owner's share of net revenues. In all events, however, the manager must disburse to the co-owners their shares of net revenues within three months from the date of receipt of those revenue. . . . In addition, the management agreement may authorize the manager to obtain or modify insurance on the Property, and to negotiate modifications of the terms of any lease or any indebtedness encumbering the Property, subject to the approval of the co-owners. (See section 6.05 of this revenue procedure for conditions relating to the approval of lease and debt modifications.) The determination of any fees paid by the co-ownership to the manager must not depend in whole or in part on the income or profits derived by any person from the Property and may not exceed the fair market value of the manager's services. Any fee paid by the co-ownership to a broker must be comparable to fees paid by unrelated parties to brokers for similar services.

Revenue Procedure at § 6.12. Thus, even though co-owners may delegate ministerial or routine functions to a manager, the co-owners must remain in control and retain the power to terminate the manager on at least an annual basis.

As described above, to comply with the Revenue Procedure, the co-owners must unanimously approve (1) the hiring of any manager, (2) all sales of the Real Property, (3) all leases and lease modifications, and (4) all loans and loan modifications; all other decisions may be made with the approval of a majority of the co-owners. This means that the co-owners may not delegate authority over such matters to a manager or other party. Therefore, the co-owners (and not a sponsor or other party) must remain in control of their commonly-owned property.

The Revenue Procedure is intended to differentiate co-ownership arrangements from partnerships and other business entities for federal income tax purposes. The key factors that distinguish a true co-ownership arrangement from an entity for tax purposes also help to distinguish a real estate investment from a security for securities laws purposes.

The owner of a whole property has the absolute right to sell, finance, lease and re-lease the property and to hire and terminate property managers. The Revenue Procedure requires that each co-owner have the same sort of rights that a whole property owner would have with respect to a typical investment property. These factors demonstrate that the co-owners are in control of the property for securities laws purposes; thus, even if the property is sponsored by a promoter who leases or manages the property, the co-owners remain in control of the property.

Our opinion is subject to the following assumptions:

1. We have assumed that there will be no more than 35 Tenants in Common in any Real Property.



# HIRSCHLER FLEISCHER

2. We have assumed that neither the Company nor any affiliate will provide any development or related services for the Tenants in Common. Any alterations or improvements to the Real Property made by the Master Lessee will be done for its own benefit pursuant to the Lease.

3. We have assumed that the Tenants in Common and the Company and its affiliates will not enter into any agreements relating to the Real Property other than the Transaction Documents.

4. We have assumed that none of the purchase price paid for a TIC Interest is attributable to future development of the Real Property.

5. We have assumed that none of the promotional materials or statements by the Company, its affiliates, and its agents indicates that (a) the Company, its affiliates, or a third party will manage the Real Property on behalf of the Tenants in Common, (b) the Company, its affiliates, or a third party will undertake entrepreneurial efforts on behalf of the Tenants in Common, (c) the acquisition of a TIC Interest is primarily an investment, rather than the purchase of an undivided fractional tenant in common interest in real estate, or (d) the Real Property will appreciate or produce earnings as a result of the efforts of the Company or others.

6. We have assumed that the Lease is a commercially reasonable lease that provides for rental rates and terms comparable to local market rates and conditions existing when the Lease is executed. We have assumed further that the Lease will be similar to other common whole-property triple net leases in the real estate industry, many of which involve subtenants.

7. We have assumed that the Tenants in Common will not be forced to rely on any particular non-replaceable expertise of the Company or its affiliates.

8. We have assumed that the Tenants in Common will not be induced to acquire their TIC Interests on the promise that the Company or its affiliates have any unique understanding of the Real Property.

9. We have assumed that all Tenants in Common will have hands-on experience in owning and operating developed, income-producing real estate and are aware of and intend to exercise their control rights under the Transaction Documents.

10. We have assumed the genuineness of all documents supplied to us, that there will be no agreements or arrangements materially modifying such documents, and that the parties will act in accordance with the terms of such documents.

11. We also have assumed that the representations in the Officers' Certificate are true, complete and correct in all respects as of the date of this letter.

Our opinion is based upon the following legal reasoning:

Federal securities laws define the term "security." Courts have observed that the definition of a "security" is essentially the same under 1933 Act and the 1934 Act. *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982). Under the 1933 Act, a "security" is defined as:



**HIRSCHLER FLEISCHER**

any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, **investment contract,** voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group of index of securities (including any interest therein or based on the value thereof), or any put, call straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe or purchase, any of the foregoing.

15 U.S.C. Sec. 77(b)(1) (emphasis added). Neither real estate nor a TIC Interest in real estate is specifically included in the above definition.

Generally, the sale of real estate is not considered the sale of a security. This position is recognized in the decision of the First Circuit Court of Appeals in *Rodriguez v. Banco Cent. Corp.,* 990 F.2d 7 (1st Cir. 1993). In that case, the court recognized that an ordinary sale of real property does not give rise to a security. According to the court:

> [a] simple sale of land, whether for investment or use, is not a "security." Even if bought for investment, the land itself does not constitute a business enterprise, and "securities" are interests in an enterprise. Thus, one who buys raw land or even a building, hoping to profit from rents or the natural increase in the value of property, is not under normal circumstances treated as purchasing a "security."

*Id.* at 10 (citations omitted). Or as the court explained in *Elson v. Geiger,* 506 F. Supp. 238 (E.D. Mich. 1980), although "[e]very lessor, in some measure, is reliant upon his commercial lessee's ability to manage the business profitably . . . such reliance will not render every commercial lease a security." *Id.* at 243; see also, *First National Bank of Lake Wilson v. Western Financial, Inc.,* 403 F. Supp. 701, 704 (D. Minn. 1975)(purchase of lessor's interest in personal property held not to be a transaction involving an investment contract). In short, when a landlord leases real property, the return to the landlord is not derived from the efforts of anyone else. Instead, the return to the landlord is derived simply from the value of the leased property and the tenant's willingness to pay for the right to use the property.

In addition, the SEC has published some guidance on when real estate interests do not involve securities. On January 4, 1973, the SEC issued its Release No. 5347 (the "SEC Release") concerning the applicability of the federal securities laws to offers and sales of condominiums or units in a real estate development. The SEC Release states that "the offer of real estate as such, without collateral arrangements with the seller or others, does not involve the offer of a security." In the context of real estate developments, the SEC Release describes some of the collateral or ancillary arrangements that may cause a real estate interest to be characterized as involving a security. If the collateral agreement indicates that the "offeror is offering an opportunity through which the purchaser may earn a return on his investment through the managerial efforts of the promoters or a third party in their operation of the enterprise," the interest is more likely to be a security. The SEC noted that such an arrangement involving the managerial efforts of others could be considered an "investment contract" or a "profit sharing arrangement," both of which are express terms listed in the definition of a "security" in the 1933 Act.



# HIRSCHLER FLEISCHER

The SEC Release indicates that the following arrangements involve securities (although these arrangements specifically refer to condominiums, the SEC Release states that the concepts are applicable to other types of real estate interests):

> Public offerings of condominium units involving rental pool arrangements, under which the promoter or a third party undertakes to rent the units on behalf of the actual owners during the period of time that the unit is not in use by the owner. Rents received and expenses attributable to all units in the development are combined and the individual owner receives a ratable share of the rental proceeds regardless of whether his individual unit was actually rented.

> Condominium units offered with a contract or agreement that places restrictions, such as required use of an exclusive rental agent or limitations on the period of time the owner may occupy the unit, on the purchaser's occupancy or rental of the property purchased. Such restrictions suggest that the purchaser is in fact investing in a business enterprise, the return from which will be substantially dependent on the success of the managerial efforts of other persons.

According to the SEC Release, "the manner of offering and economic inducements held out to the prospective purchaser play an important role in determining whether the offerings involve securities." The SEC Release cites *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344 (1943), as authority for considering representations made to potential purchasers when determining if the interest offered is a security. Such representations may include the offering of a rental pool or other similar arrangement that emphasizes the economic benefits to the purchaser to be derived from the managerial efforts of the promoter or a third party designated or arranged by the promoter. Such representations also may include the offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit. The SEC Release suggests that a court should rule that an interest is a security when representations are made that emphasize the economic benefit of a collateral agreement.

The SEC Release does note that an owner of a condominium unit may, after purchasing the unit, enter into a non-pooled rental arrangement with an agent not designated or required to be used as a condition of the purchase without causing the sale of the unit to be classified as the sale of a security. The SEC Release concludes by noting that the determination of whether a real estate interest is a security is very fact-specific.

While neither real estate nor a TIC Interest in real estate is specifically included in the definition of "security" in the 1933 Act, the concept of an "investment contract" is included in the definition. The SEC and courts have, on limited occasions, used certain other analytical methods to determine if a "security" is present in any legal or economic relationship; however, it is far more likely that a traditional investment contract analysis would be used in assessing the applicability of the federal securities laws to the offer and sale of TIC Interests in the Real Property.

The traditional investment contract analysis was enunciated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). In *Howey*, the Supreme Court held that units of a Florida citrus grove development, coupled with contracts for management of the groves, were securities. The management contracts had ten-year terms, and purchasers of units could not cancel the contracts. The contracts gave the management



company (an entity related to the selling entity) "a leasehold interest with 'full and complete' possession of the grove and full discretion and authority over cultivation of the groves and the harvest and marketing of the crops." *Id.* at 295-96. Investors were not allowed to enter the groves or market the crops without consent of the management company. *Id.* at 296. The Court also noted that investors were non-residents of Florida who lacked the expertise to manage the groves. *Id.* Investors were not required to enter into management contracts with the "preferred" management company in order to purchase interests in the groves, but it was "enough that the [seller and management company] merely offer[ed] the essential ingredients of an investment contract." *Id.* at 301.

In *Howey,* the Court created a four-prong analysis to determine whether a financial interest constitutes an investment contract. All four elements must be satisfied for an investment contract, thus a security, to be present. An investment contract is one in which there is: (1) an investment of money, (2) in a common enterprise, (3) in which the investor is led to expect profits, (4) solely from the efforts of a promoter or a third party (as explained below, the word "solely" should not be taken literally). When applying the *Howey* test to a particular investment, the courts disregard the form, and look to the substance, of the investment and focus on the economic reality of the transaction. *United Housing Found. v. Forman,* 421 U.S. 837, 848 (1975). This rule was followed and restated by the court in *McCown v. Heidler,* 527 F.2d 204, 208 (10th Cir. 1975), as follows: "The characterization of a particular investment as a security within the purview of securities regulation should depend, not upon the form, but upon the substance and economic reality of the transaction in question."

The offer and sale of TIC Interests contemplated by the Transaction Documents would likely to satisfy the first element (an investment of money) and the third element (expectation of profits) of the *Howey* test. However, they are unlikely to satisfy the fourth element (efforts of others) of the *Howey* test and, as described below, the law is presently unclear on the second element (common enterprise).

The first element of the *Howey* test, an investment of money, is seldom a significant issue when attempting to identify an investment contract. Over the years, the courts have broadly interpreted this element and have not limited it to cash. All that is required under this first element is that the purchaser gives up some tangible and definable consideration. *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 560 (1979). In the transaction contemplated by the Transaction Documents, the Tenants in Common (even if they are acting in connection with a Section 1031 exchange) will be purchasing their TIC Interests in exchange for cash and possibly the assumption of a certain amount of debt. Thus, the consideration given by the Tenants in Common in exchange for their TIC Interests should meet the first element of the *Howey* test.

The second element of the *Howey* test requires the existence of a common enterprise or commonality. The common enterprise element found in *Howey* is generally described as "horizontal commonality," although some courts subsequently have turned to alternative analyses, generally described as "vertical commonality" for satisfaction of this second element.

In *Howey,* the common enterprise element was satisfied because multiple investors purchased ownership units in the orange groves. There is general agreement among courts that the common enterprise element of the *Howey* test is satisfied when there is a pooling of interests of several investors who share the investment risks and benefits of the business enterprise with each other. *SEC v. ETS Payphones, Inc.,* 300 F.3d 1281, 1283-84 (11th Cir. 2002)(acknowledging horizontal commonality as the test in most circuits, but upholding precedent that broad vertical commonality is proper test in the 11th Circuit), rev'd on unrelated grounds sub nom. *SEC v. Edwards,* 124 S. Ct. 892. It is unclear whether



HIRSCHLER FLEISCHER

tenant in common ownership of real estate satisfies the horizontal commonality element of the *Howey* test. Under the tenant in common form of co-ownership, each Tenant in Common is entitled to income and loss on a pro rata basis in accordance with his ownership of the Real Property. There will be at least two Tenants in Common and, to some extent, the investment risks with respect to the Real Property are shared because the Real Property is commonly owned. However, each Tenant in Common independently may encumber or dispose of his TIC Interest. Moreover, there is no business enterprise in the normal sense (see discussion of the Revenue Procedure above) beyond the provisions in the TIC Agreement that address the practicalities associated with ownership and operation of a commonly owned property.

When faced with investor losses arising out of arrangements involving only one investor and one promoter, some courts have turned to an alternative analysis of the common enterprise element of the *Howey* test. In *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973), the SEC argued, and the court adopted, a "vertical commonality" analysis. In some jurisdictions, vertical commonality is found to exist when the fortunes of the investor are interwoven with, and dependent upon, the efforts and success of the promoter in a common enterprise. Not all courts have adopted this version of the common enterprise element.

In *Glenn W. Turner Enter.*, the defendant sold "adventures" and "plans," which were essentially courses that promised to improve a participant's sales abilities. By completing a certain number of "adventures," participants became "licensed" to introduce the "adventures" to new customers for a portion of the purchase price of any program sold. The Ninth Circuit noted that this structure demonstrated that purchasers of the programs were not really buying the programs, but rather the possibility of deriving money from the sale of the plans to others. *Id.* at 478. The court discussed *Howey*, stating that if the *Howey* test were satisfied except that profits are not expected to come <u>solely</u> from the efforts of others, the interest may still be a security. *Id.* at 482. The court held that a dogmatic application of the word "solely" would not serve the remedial purposes of the federal securities laws and "that a more flexible approach is appropriate." *Id.* at 483. Here, the purchaser is sold "the idea that he will get a fixed part of the proceeds of the sales" from future purchasers. *Id.* at 482. To obtain his part of the proceeds, "he invests three things: his money, his efforts to find prospects and bring them to meetings, and whatever it costs him to create an illusion of his own affluence." *Id.* It is then up to the company to sell the product. The company could not sell the product without the introductions made by current customers, and current customers could not receive their fixed part of the sales proceeds without the sales efforts of the company. In this way, the investor's success was interwoven with the success of the party seeking investment. Although the Supreme Court has referred to the holding in *Glenn W. Turner Enter.* (see *Forman*, supra), it has never explicitly affirmed the use of a vertical commonality analysis.

The vertical commonality analysis has been adopted in the Fifth, Ninth and Eleventh Circuits, as well as some district courts, most notably in New York. Even within those circuits, two variations of the vertical commonality analysis have developed, one more restrictive than the other. The first variation is known as "broad vertical commonality," and requires simply a link between the investor's fortunes and the promoter's efforts. *Lavery v. Kearns*, 792 F. Supp. 847 (D. Me. 1992). The other variation is known as "narrow commonality," or narrow vertical commonality, is a compromise between requiring horizontal commonality and broad vertical commonality and exists when the fortunes of the investor rise and fall with those of the promoter or other third party. *Id.*

The Ninth Circuit follows the narrow vertical commonality approach where there must be a "direct relation between the success or failure of the promoter and that of his investors." *Mordaunt v.*



# HIRSCHLER FLEISCHER

*Incomco*, 686 F.2d 815 (9th Cir. 1992). In *SEC v. TLC Investments and Trade Co.*, 179 F. Supp. 1149 (C.D. Calif. 2001), a U.S. District Court in California addressed the issue of whether tenancy in common interests meet the vertical commonality test used in the Ninth Circuit. In this case, the SEC alleged that the defendant had engaged in a nationwide Ponzi scheme by "representing to investors that it would use their money to refurbish and resell distressed real estate, which TLC guaranteed would create a rate of return between 8% and 15%." TLC told each investor that his investment would be secured by an interest in real property, which would be held by the investor and TLC as tenants in common. *Id.* at 1151. TLC did not invest in real estate as planned, but rather used the money on racehorses and dogs, a fraudulent bank scheme, and highly risky investments. Alleging securities fraud, the investors sued. TLC argued that the investments were not securities. The court held that, as advertised, the investments were tenancies in common. The representations made to the investors were the deciding factor. The court stated, "here, the TLC investments have vertical commonality. Under the plan as advertised, TLC and the individual investor would take the property as tenants in common. TLC's fortunes were, therefore, inextricably linked to the fortunes of the individual investors. So long as the promoter's gain is contingent on the investor's gain, there is a common enterprise." *Id.* at 1156.

The Fifth and Eleventh Circuits follow the more liberal broad vertical commonality approach where "the requisite commonality may be evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the promoter's efforts." *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974). In *Long v. Schultz Cattle Co., Inc.*, 881 F.2d 129 (5th Cir. 1989), the court held that under its approach to vertical commonality, the agreements (investments in a cattle-feeding program) were securities because "the fortuity of the investments collectively is essentially dependent upon promoter expertise." *Id.* at 140. Investors were entirely lacking the business acumen possessed by the promoters. The success of the investment depended exclusively on the ability of the promoter to advise when and how much to hedge. *Id.* at 140.

In *SEC v. Comcoa Ltd.*, 855 F. Supp. 1258 (S.D. Fla. 1994), a Florida District Court applied a similar analysis. In *Comcoa*, the SEC alleged that Comcoa was selling unregistered securities in the form of FCC licenses. *Id.* at 1259. Although Comcoa asserted that it only sold aid in the application process for FCC licenses, the court found that investors paid a minimum of $7,000 per license, and that they each depended entirely on Comcoa to act upon the licenses (licenses must be acted upon within eight months of issuance or they are forfeited). Investors did not have the expertise to set up the required telecommunications tower or to find a buyer, lessee or systems operator for the licenses. The court found that each investor's risk of financial loss was "greatly enhanced" without the expertise of Comcoa. *Id.* at 1260. The court held that because investors' fortunes were entirely dependent on Comcoa's skill at preparing, filing and obtaining licenses and then arranging for the lease of the licenses, vertical commonality existed. *Id.*

With respect to the TIC Interests in the Real Property, we believe it is unclear whether the common enterprise element of the *Howey* test may be met under application of horizontal commonality analysis, although we believe it is unlikely to be met under application of either of the vertical commonality analyses. Each Tenant in Common may encumber or sell his undivided fractional interest in the Real Property. There will not be a pooling of the assets of all of the Tenants in Common in the sense of a business enterprise, but there is a common ownership of the Real Property. Each Tenant in Common will share in the risks and benefits of the Lease in particular and the Real Property in general in proportion to his ownership interest independently of the other Tenants in Common. In addition, the collective ability of the Tenants in Common to terminate the Lease and/or replace the Master Lessee (who is an affiliate of the sponsor, FOR 1031 LLC) should prevent any finding of a common enterprise under a



# HIRSCHLER FLEISCHER

broad vertical commonality analysis. Further, because the fortunes of the Tenants in Common are not tied to the fortunes of the Master Lessee (i.e., under the Lease, the Master Lessee may suffer a profit or loss independently of any profit or loss suffered by the Tenants in Common), there should be no finding of narrow vertical commonality.

In conclusion, the law is presently unclear on the common enterprise element of the *Howey* test due to a split in authority in the Circuits, which has created uncertainty as to which analysis should be applied. While valid arguments can be made that the TIC Interests do not satisfy the second element of the *Howey* test, final resolution may only come in the future as the courts refine and reconsider which analysis should be applied.

The third element of the *Howey* test requires an expectation of profits. This element was refined in *Forman*, where the Court noted that "profits" may refer to both capital appreciation from the development of the initial investment and participation in earnings resulting from the use of the investors' funds. *Forman* at 852-58. This element often is found to be evidenced by a promoter's own marketing and advertising materials which are used to interest and induce investors to purchase.

In *Forman*, for income tax purposes, purchasers of shares in a cooperative apartment building were entitled to deduct from their gross incomes that portion of their monthly rent that was applied by the cooperative to interest payments secured by its mortgage (tax benefits were not emphasized in the marketing). The court noted that even if these tax deductions constituted profits or income, they still were not associated with a "security" because they were not dependent on the managerial efforts of others. *Forman* at 855, note 20. This conclusion was followed in *Meade v. Weber*, 647 F.Supp. 954 (E.D. La. 1986), where the plaintiff invested in an enterprise, the sole purpose of which was to obtain research and development tax benefits, investment tax credits and other tax shelters. The court in *Meade* held that if the only goal of an investment is to receive tax benefits through the utilization of a tax-shelter device, the investment does not constitute a security. *Id.* at 956.

Other U.S. Courts of Appeal have not had difficulty distinguishing the circumstances in *Meade* from those in *Forman*. Those courts have held the "profit" element is satisfied where tax benefits arising from the transaction were an important part of the promoter's marketing efforts to induce the purchaser. See, e.g., *Long v. Schultz Cattle*, supra, and the cases cited in *Long* at n. 2. The court in *Long* distinguished the *Forman* opinion's comments about tax deductions by noting that the *Long* investors were "drawn by the prospect of gaining significant tax benefits through the efforts of others."

Recently in *SEC v. Edwards*, 124 S. Ct. 892 (2004), the Supreme Court clarified its *Forman* holding by stating,

> [T]hus, when we held that "profits" must "come solely from the efforts of others," we were speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest. We used "profits" in the sense of income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment.

*Id.* at 897

The Transaction Documents do not market property appreciation or Section 1031 tax benefits that may be associated with the purchase of a TIC Interest in the Real Property. However, it is likely that


those issues may be discussed by the various parties in contemplation of a purchase, and the Tenants in Common have an expectation of realizing certain property appreciation and/or tax benefits at the time of their purchases. On the other hand, the Transaction Documents do make clear that the Tenants in Common will receive income under the Lease from the Master Lessee. As such, the Tenants in Common may be found to have an expectation of profits within the meaning of the *Howey* test.

The fourth element of the *Howey* test requires that the expected profits come "solely from the efforts of the promoter or a third party." The "efforts of others" element of the *Howey* test turns upon an analysis of the functions and role served by a promoter or party other than the investor. While the Court used the word "solely" in formulating its original analysis, the term should not be read literally. In *Forman*, the court expressly reserved judgment whether "solely" should be interpreted literally. The Court simply omitted the word "solely" from its reiteration of the *Howey* test. See *International Brotherhood of Teamsters*, 439 U.S. at 561. Ten circuits have adopted a more liberal and flexible interpretation of "solely" by simply requiring proof that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which effect the failure or success of the enterprise." See *Glenn W. Turner Enter.*, 474 F.2d at 482. In determining whether an investor's profits are expected to derive from the efforts of others, courts typically look at a promoter's involvement as represented to investors, as well as the promoter's actual involvement in the investment.

A significant factor in determining the satisfaction of this fourth element is the amount of control that the investor has over the investment. So long as the investor retains ultimate control that is not illusory, the fourth element of the *Howey* test should not be found to exist. *Perry v. Gammon*, 583 F. Supp. 1230 (N.D. Ga. 1984). The Eighth Circuit has made this rule clear, stating in *Albanese v. Florida National Bank of Orlando*, 823 F.2d 408 (8th Cir. 1987) that if "the investor retains the ability to control the profitability of his investment, the agreement is no security." *Id.* at 410. The right to control the asset that has been purchased is of critical importance because, with the right to control the asset, the purchaser is not dependent on the promoter or on a third party for significant efforts that are essential to the success of the purchased asset. See *Williamson v. Tucker*, 645 F.2d 404, 417-25 (5th Cir. 1981). On the other hand, if the investor's duties are nominal and insignificant and they lack any real control over the operation of the enterprise, a dependence on the efforts of others will be found to exist. *Fargo Partners v. Dain Corp.*, 540 F.2d 912, 914-15 (8th Cir. 1976).

The "efforts of others" element was applied and found to be lacking in a real estate context in *Gordon v. Terry*, 684 F.2d 736 (11th Cir. 1982). Gordon invested $4 million in five different real estate syndications. Terry purchased large tracts of land in Florida, which he told Gordon would be resold in two years to developers for substantial profits. A Florida bank acted as trustee in the syndication agreements. The trust agreements gave investors substantial control over the property (investors could make any decision regarding the properties by vote of holders of 60% or 70% of the interests in the ventures). Gordon also alleged that Terry made it a condition of investment that none of the investors meet each other, that they were to deal only with Terry and his designated agents, and that they place "absolute faith" in Terry. *Id.* at 740. When the investment failed to bring the promised returns, Gordon sued, alleging that he had purchased securities interests that were subject to the federal securities laws.

The court in *Gordon* held that under the *Howey* test, this particular real estate syndication was not an investment contract because the contracts gave the investors "very real control" over their investments. All expected profits would be through no one's efforts. *Id.* at 741. The court emphasized the fact that investors were given control over the property in the trust agreements as an indication that other people were not responsible for any expected profits. According to the court,



> [a]n investor who has the ability to control the profitability of his investment, either by his own efforts or by majority vote in group ventures, is not dependent upon the managerial skills of others. Thus, general partnerships and other arrangements which grant the investors control over the significant decisions of the enterprise are not securities.

*Id.*

A number of courts have held that general partnership interests are rebuttably presumed not to involve securities because all partners typically hold control and have access to important partnership information. *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236 (4th Cir. 1988) (partnership to acquire, own, lease and operate multi-purpose fishing vessels held not to be an investment contract). When a partnership agreement gives power to the general partners that is "specific and unambiguous, and when those powers are sufficient to allow the general partners to exercise ultimate control, as a majority, over the partnership and its business," then the court will presume that the general partnership interests are not securities. *Id.* at 241. It is not necessary that the partners exercise decisive control over major decisions for the partnership interests to fall outside the definition of security. If partners "have the sort of influence which generally provides them with access to important information and protection against a dependence on others, "the partnership interests are presumed not to be securities." *Id.* The Fourth Circuit recently built upon this holding in *Robinson v. Glynn*, 349 F.3d 166 (4th Cir. 2003), when it declined to find a security in the sale of a limited liability company interest to an investor who possessed and exercised some managerial control over the company but who lacked the specialized technical knowledge of the company that other investors and the promoter possessed. Robinson argued that his lack of expertise prevented him from meaningfully exercising his rights. *Id.* at 171. The court disagreed, stating,

> Robinson's argument would work a fundamental and unjustifiable expansion in the securities laws by bringing innumerable commercial ventures within their purview. . . . [T]he securities laws do not extend to every person who lacks the specialized knowledge of his partners or colleagues, without a showing that this lack of knowledge prevents him from meaningfully controlling his investment. Here, Robinson concedes that "nothing of consequence that would affect [his] position adversely could be done without [his] prior expressed approval," thus undermining his claim that his lack of technical expertise left him powerless over his investment. In essence, Robinson was a savvy and experienced businessman who negotiated for formal management rights and actively exercised those rights, only now relying on his lack of technical sophistication to claim the cover of the federal securities laws.

Id. at 171-72.

We are aware that if the power to control an investment is illusory, or if the investors are not "in fact capable of exercising" such power, then actual control will be deemed not to exist. *Albanese*, 823 F.2d at 412. See also *Williamson*, supra. The power to control an investment becomes illusory and the investors are not capable of exercising their power if an investor is "so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his . . . venture powers," or "so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful . . .


venture powers." *Williamson*, 645 F.2d at 424. In other words, the investor must be unable to exercise meaningful control powers and be forced to rely on someone else for the success of the enterprise. *Gordon*, 684 F.2d at 741. Whether or not the right to control is actually exercised is not relevant in assessing whether or not the investors are capable of exercising their power. *Fargo Partners*, 540 F.2d at 915. See also, *Long*, supra.

In analyzing the practical ability of investors to exercise their legal rights to control their investment, the number of investors can be a factor. In *SEC v. Telecom Mktg.*, 888 F. Supp. 1160 (N.D. Ga. 1995), general partnership interests in a wireless cable television system were sold to over 2,600 investors. *Id.* at 1163. Although on their face, the partnership agreements gave investors legal power over the partnership's activities, in reality "investors were targeted for their ignorance of law, accounting and the wireless cable television industry." *Id.* at 1166. The court noted that the number of partnership units sold "so dilutes each partner's power that in actuality it appears none could exercise any meaningful partnership control." *Id.*

Moreover, under the Transaction Documents, each Tenant In Common retains control over the Real Property. Because the Tenants in Common are sophisticated owners of Real Estate, their power to control the Real Property is not illusory. If they terminated the Lease, the Tenants in Common would either manage the Real Property themselves or hire a third party property manager. The operation of the Real Property is not so esoteric as to require skills beyond the abilities of a professional property manager that can easily be found and engaged by the Tenants in Common.

In applying the above guidance to the facts of the proposed transaction, we believe that the fourth element of the *Howey* test is not met, and accordingly, no investment contract should be found to exist. Because the Tenants in Common maintain control over the Real Property, their expected profits should not be said to come from the significant efforts of others. Although the Tenants in Common may find that leasing the Real Property to the Master Lessee is a convenient and attractive option, they have the power and the mechanism to terminate the Lease at any time and to pursue a different master lessee, to lease the property themselves, or to hire a property manager. Furthermore, each Tenant in Common will be a knowledgeable and experienced real estate investor with prior hands-on experience in owning and operating commercial real estate. Each Tenant in Common will have access to the necessary information to make informed, knowledgeable decisions concerning the operation of the Real Property. In sum, the Tenants in Common have ultimate control that they are capable of exercising because they will have the legal power to control their investment, coupled with the practical ability to exercise that legal power. Moreover, power over the Real Property does not lie only in the Tenants in Common collectively, rather each Tenant in Common also has the power to cause a partition or sale of the Real Property. The exercise of such a right will result in either the purchase of the Tenant in Common's TIC Interest or the sale of the Real Property. Either result, however, further evidences the control of each Tenant in Common over his investment, and accordingly, the conclusion that the profits of his investment are to be the result of his own efforts.

We are aware of the SEC No-Action Letter that found that certain tenant in common interests in real property were securities within the meaning of the 1933 Act. *Triple Net Leasing, LLC* (August 23, 2000). The SEC staff offered no commentary and gave no indication where this fact pattern might fall on a spectrum of analytical factors. However, the facts of the transaction presented in the letter differ materially from those in the proposed transaction in at least one very important way: the lease in the letter provided for a fixed term of 10-15 years but without any cancellation rights in favor of the tenants in common. The tenants in common in the letter were thus stripped of the ability to control the operation



of the real property they owned. In contrast, the Lease in the proposed transaction allows for termination at any time regardless of the designated term. Such a termination right in the hands of experienced real estate investors, who are provided both adequate and timely information concerning the property they own and the means to communicate among themselves with respect to the operation of their property, presents substantially different circumstances than those described in the *Triple Net Leasing, LLC* no-action letter.

We also are aware of the U.S. Supreme Court's recent decision in *Edwards* and the Ninth Circuit's ruling in *SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003). In *Edwards*, the respondent's company, ETS Payphones, Inc., sold payphones to the public via independent distributors. The payphones were offered with an agreement under which ETS leased back the phones from the purchaser for a fixed monthly payment, along with a site lease, management agreement and buyback agreement. Other management options were offered. When the payphones did not generate enough revenue for ETS to make the lease payments, the company filed for bankruptcy, and the SEC brought civil enforcement action claiming that ETS had violated the registration and anti-fraud provisions of the federal securities laws. *Edwards*, 124 S. Ct. at 895-96. The District Court concluded that the payphone sale and leaseback arrangement was an investment contract. *SEC v. ETS Payphones, Inc.*, 123 F. Supp. 2d 1349 (N.D. Ga. 2000). The Court of Appeals reversed, holding that the arrangement was not an investment contract on two grounds: first, it read the Supreme Court's opinions to require that an investment contract offer either capital appreciation or a participation in the earnings of the enterprise, and thus to exclude arrangements offering a fixed rate of return; and second, it held that the Supreme Court's requirement that the return on the investment be "derived solely from the efforts of others" was not satisfied when the purchasers had a contractual entitlement to the return. *SEC v. ETS Payphones, Inc.*, 300 F.3d 1281, 1285 (11th Cir. 2002). The Supreme Court held that "there is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the [*Howey*] test," and that "an investment scheme promising a fixed rate of return can be an 'investment contract' and thus a security subject to the federal securities laws." *Edwards* at 897-98. The Court also held that "the Eleventh Circuit's perfunctory alternative holding, that respondent's scheme falls outside the definition because purchasers had a contractual entitlement to a return, is incorrect and inconsistent with our precedent." *Id.* at 898. The Court reversed and remanded the case to the Eleventh Circuit for proceedings consistent with its opinion. *Id.* at 899.

Some commentators have concluded that the Court's decision in *Edwards* equates to a holding that a sale and leaseback arrangement is an investment contract. We believe such a conclusion is too broad a reading of the case. We believe that a more reasonable interpretation of the Court's decision is found in the text of the opinion itself; namely, that the "profits" element of the *Howey* test can be satisfied by means of a fixed as well as a variable return.

In *Rubera*, the Ninth Circuit confronted a similar payphone sale and management arrangement. The major difference was that the expected rate of return was variable in *Rubera* and fixed in *Edwards*. In *Rubera*, the court held that the arrangement did satisfy the *Howey* test and was an investment contract. The Ninth Circuit placed considerable weight on the fact that the sale of the payphones and affiliated management contract were marketed as a single package, and overwhelmingly sold to inexperienced passive investors.

Both *Edwards* and *Rubera* can be distinguished from the facts in the proposed transaction. Unlike the proposed transaction, the *Edwards* and *Rubera* investors had little or no experience in the industry and lacked the knowledge and expertise necessary to place, install and maintain their payphones and to realize any return, and thus, were dependent on the continuing involvement of the promoter.





HIRSCHLER FLEISCHER

Conversely, the Tenants in Common should be sophisticated real estate investors and operators, with access to professional advisors. Armed with both prior experience in owning and operating commercial real estate, and timely information concerning the operations of the Real Property, the Tenants in Common will have the practical ability, and through the Transaction Documents, legal authority, to replace the Master Lessee at any time without surrendering the ability to realize a meaningful return.

When all of the foregoing authorities are taken into consideration together with the facts and circumstances contemplated by the Transaction Documents, and subject to the qualifications set forth in this opinion, it is our view that a court should conclude that the TIC Interests in the Real Property do not constitute securities under the federal securities laws. This opinion is predicated, however, upon all the facts and assumptions set forth in this letter. If any of the facts or assumptions are incorrect, our opinion could change.

It is implicit in such an opinion, and we hereby make explicit, the understanding that our opinion does not assure, ensure or insure against an adverse result. Accordingly, an adverse determination by the courts or the SEC is not inconsistent with this letter generally or the particular opinions we have expressed. This letter is issued with the express understanding that the courts or the SEC may disagree with our analysis.

Legal opinions generally, and this legal opinion in particular, should not be construed as a policy of insurance or other form of indemnification in the event of an adverse determination by the SEC or courts of applicable jurisdiction. This opinion is delivered subject to this understanding and agreement.

Our opinion is subject to the following further qualifications, limitations and exceptions:

No opinion is expressed in this letter about the tax treatment of the transaction described herein for purposes of any federal, state or local income tax. Accordingly, we give no opinion in this letter as to whether the proposed transaction will qualify under Section 1031 of the Code.

The law covered by this opinion is limited to the federal law of the United States as set forth in codified statutes and reported case decisions. Although state securities laws are generally quite similar to federal securities laws, we express no opinion with respect to the law of any other jurisdiction and no opinion with respect to the statutes, administrative decisions, rules, regulations, or requirements of any state, county, municipality, subdivision or local authority of any jurisdiction.

Our opinion addresses the law relative to the fractional tenant in common interests in the Real Property, and our opinion does not address any investment in an interest in an entity purchasing the tenant in common interests. For example, it is expected that investors will form a limited liability company to purchase a tenant in common interest; our opinion addresses only the purchase of the tenant in common interest in the Real Property, not the acquisition of the membership interest in the limited liability company by any investor.

Any misstatement of a material fact or omission of any fact that may be material or any change in any of the facts referred to herein may require a modification of all or a part of our opinion.

With respect to some of the matters discussed in this letter, existing legal precedent provides little guidance. Although the opinions and views we express in this letter are based upon our interpretation of



# HIRSCHLER FLEISCHER

the law in effect as of the date of this letter, we can give no assurance that the SEC or the courts will not take a position contrary to the opinions expressed in this letter.

Our opinion is limited to the matters expressly set forth herein and no opinion may be implied or inferred beyond the matters so stated, including, without limitation, any opinion with respect to the following matters: (a) federal banking laws or credit laws, rules, and regulations; (b) federal Reserve Board margin regulations; (c) pension and employee benefit laws and regulations (e.g., ERISA); (d) Federal and state antitrust and unfair competition laws and regulations; (e) compliance with fiduciary duty requirements; (f) federal and state environmental laws and regulations with respect to the Real Property; (g) federal and state land use and subdivision laws and regulations; (h) real estate brokerage laws and regulations; (i) except as explicitly provided in this letter, federal securities laws and regulations administered by the SEC and state "Blue Sky" laws and regulations; (j) federal patent, copyright, and trademark, state trademark, and other federal and state intellectual property laws and regulations; (k) federal and state racketeering laws and regulations (e.g., RICO); (l) federal and state health and safety laws and regulations (e.g., OSHA); and (m) federal and state labor laws and regulations.

This opinion is being delivered to you in connection with the sale of undivided fractional interests in the Real Property pursuant to the above-described factual situation and documents. This opinion may be relied upon by only you solely in connection with the sale of such interests. Our opinions set forth in this letter are based upon the laws in effect on the date of this letter. We do not undertake to advise you of any changes in law that may occur after the date of this letter, regardless of whether changes in such facts or laws come to our attention after the delivery of this letter.

Very truly yours,

HIRSCHLER FLEISCHER,
A PROFESSIONAL CORPORATION

Louis J. Rogers
Vice President